**F I L E D**

<u>PUBLISH</u>

**December 20, 2005**

## UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

---

PEPSI-COLA BOTTLING COMPANY OF
PITTSBURG, INC.,

     Plaintiff-Appellant,

v.

PEPSICO, INC.; BOTTLING GROUP, LLC,

     Defendants-Appellees.
--------------------

A.D. HUESING BOTTLING WORKS, INC.;
HARCO DISTRIBUTORS, INC.;
INTERACTIONS, INC.; LAKESIDE
BOTTLING CO.; LIME ROCK SPRINGS CO.;
M.B.C. INC.; NEWBERRY BOTTLING
COMPANY, INC.; NORTH STAR
BEVERAGE COMPANY, INC.; NORTHERN
BOTTLING CO., INC.; PEPSI-COLA
BOTTLING CO. OF ALLIANCE, INC.;
PEPSI-COLA BOTTLING COMPANY OF
N.E. WISCONSIN, INC.; PEPSI-COLA
BOTTLING COMPANY OF NEW HAVEN,
MISSOURI, INC.; PEPSI-COLA BOTTLING
COMPANY OF BROOKFIELD, INC.; PEPSI-
COLA BOTTLING COMPANY OF
MARYSVILLE, INC.; PEPSI-COLA
MEMPHIS BOTTLING CO., INC.; PEPSI-
COLA OF THE HUDSON VALLEY;
REFRESHMENT SERVICES, INC.;
SOUTHEASTERN BOTTLING COMPANY

No. 03-3134

OF ARIZONA; STUEBER'S BEVERAGES,
INC.; THE GILLETTE GROUP, INC.;
CENTRAL INVESTMENT CORPORATION;
PEPSI-COLA BOTTLING COMPANY OF FT.
LAUDERDALE-PALM BEACH, INC.,

Amici Curiae.

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 01-CV-2009-KHV)**

---

David W. Hauber, Baty, Holm & Numrich, P.C., Kansas City, Missouri, (Todd M. Johnson, Baty, Holm & Numrich, P.C., Kansas City, Missouri; and William L. Kallal, William L. Kallal, P.C., Cheyenne, Wyoming, with him on the briefs) for the plaintiff-appellant.

Matthew J. Verschelden (David E. Everson, Jr., W. Dennis Cross, and Ann M. Scarlett, with him on the brief), Stinson Morrison Hecker LLP, Kansas City, Missouri, for the defendant-appellee PepsiCo, Inc.

Andrew H. Schapiro (Richard M. Steuer and Matthew D. Ingber with him on the brief), Mayer, Brown, Rowe & Maw LLP, New York, New York, for the defendant-appellee Bottling Group, LLC.

Scott M. Mendel (John W. Rotunno, Erik F. Dyhrkopp, and Kara A. Elgersma, with him on the brief), Bell, Boyd & Lloyd LLC, Chicago, Illinois, for amici curiae A.D. Huesing Bottling Works, Inc.; Harco Distributors, Inc.; Interactions, Inc.; Lakeside Bottling Co.; Lime Rock Springs Co.; M.B.C. Inc.; Newberry Bottling Company, Inc.; North Star Beverage Company, Inc.; Northern Bottling Co., Inc.; Pepsi-Cola Bottling Co. of Alliance, Inc.; Pepsi-Cola Bottling Company of N.E. Wisconsin, Inc.; Pepsi-Cola Bottling Company of New Haven, Missouri, Inc.; Pepsi-Cola Bottling Company of Brookfield, Inc.; Pepsi-Cola Bottling Company of Marysville, Inc.; Pepsi-Cola Memphis Bottling Co., Inc.; Pepsi-Cola of the Hudson Valley; Refreshment Services, Inc.; Southeastern Bottling Company of Arizona; Stueber's Beverages, Inc.; the Gillette Group, Inc.

G. Jack Donson, Jr., Marcia V. Andrew, Jeanne M. Bruns, Taft, Stettinius & Hollister LLP, Cincinnati, Ohio; James B. Helmer, Jr., Frederick M. Morgan, Julie W. Popham,

2

Helmer, Martins & Morgan Co., L.P.A., Cincinnati, Ohio, on the brief for amici curiae Central Investment Corporation and Pepsi-Cola Bottling Company of Ft. Lauderdale-Palm Beach, Inc.

---

Before **HENRY**, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Pepsi-Cola Bottling Company of Pittsburg, Kansas (Pittsburg Pepsi) appeals the district court's order granting summary judgment in favor of defendants PepsiCo, Inc. (PepsiCo) and its wholly owned subsidiary, Bottling Group, LLC (Bottling Group). While Pittsburg Pepsi asserts claims sounding both in tort and in contract, its overriding contention is that defendants have interfered with its contractual right to sell a full line of Pepsi products in its exclusive territory. We affirm in part, reverse in part, and remand.

## I.

As this is a summary judgment case, we review the evidence in the light most favorable to the non-moving party, which in this case is Pittsburg Pepsi. PepsiCo is a leading seller of soft drink concentrate and it controls the trademarks associated with its products. Under an Exclusive Bottling Appointment (EBA), PepsiCo enters into an individual agreement with a bottler for the bottling and distribution of its soft drink products within a designated geographic territory. Under a syrup appointment, PepsiCo enters into an individual agreement with a bottler to manufacture, sell, and distribute

3

fountain syrup within designated geographic territories.

Pittsburg Pepsi is an independent bottler of PepsiCo products.[1] In addition to PepsiCo products, Pittsburg Pepsi distributes products manufactured by other concentrate companies that do not compete with its PepsiCo products. Pittsburg Pepsi sells, on average, 500,000 cases of beverage products each year. PepsiCo issued an EBA to Pittsburg Pepsi on September 28, 1959, for Pepsi-Cola for the designated territory encompassing the Kansas counties of Bourbon, Crawford, Cherokee, and part of Labette, and part of the Missouri counties of Jasper and Barton. The EBA provided in relevant part:

> Pepsi-Cola Company . . ., herein called the Company, hereby appoints:
> Name Pepsi-Cola Bottling Company of Pittsburg, Inc.
> Address Pittsburg, Kansas
> herein called Bottler, as its exclusive bottler, to bottle and distribute the carbonated beverage known as "Pepsi-Cola" in the following described territory . . . and nowhere else. . . .
> . . . .
> 2. That the Bottler will not bottle, distribute or sell, directly or indirectly, any other cola beverage or any other beverage with the name Cola and/or any beverage which could be confused with Pepsi-Cola.
> . . . .
> 4. That the Company will sell to the Bottler, and the Bottler will purchase, at the Company's then price or prices . . . at the time of each sale, the Bottler's requirements of Pepsi-Cola concentrate or syrup for the bottling of Pepsi-Cola hereunder, payment for same to be made by the Bottler in advance of shipment; and all Pepsi-Cola concentrate or syrup so

---

[1] Although Pittsburg Pepsi is considered a bottler, it no longer operates a bottling plant. Instead, it purchases bottled Pepsi products from Wis-Pak, Inc., a Wisconsin cooperative of 27 independent bottlers (including Pittsburg Pepsi). Wis-Pak buys concentrate from PepsiCo, manufactures the products, and ships the products to members of the cooperative.

4

purchased will be used by the Bottler for the bottling of Pepsi-Cola in the Territory and for no other purpose.

. . . .

7. That the Bottler will sell the bottled Pepsi-Cola in the Territory at the Bottler's price per case plus the deposit charge for bottles and case. The Company may from time to time suggest to the Bottler the price per case to be charged by him and the deposit charge.

8. That the Bottler will push vigorously the sale of bottled Pepsi-Cola throughout the entire territory in the 12-oz. size bottle and in any other size bottle prescribed by the Company for the Territory. Without in any way limiting the Bottler's obligation under this Paragraph 8, the Bottler must fully meet and increase the demand for Pepsi-Cola throughout the Territory and secure full distribution up to the maximum sales potential therein through all distribution channels or outlets available to soft drinks, using any and all equipment reasonably necessary to secure such distribution; must service all accounts with frequency adequate to keep them at all times fully supplied with Pepsi-Cola; must use his own salesmen and trucks . . . in quantity adequate for all seasons; and must fully cooperate in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory. In addition the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotion of, bottled Pepsi-Cola throughout the Territory at his own cost and expense. . . .

. . . .

19. That this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials.

20. The failure by the Company to enforce at any time or for any period of time any one or more of the terms or conditions of this Appointment, shall not be a waiver of such terms or conditions or of the Company's right thereafter to enforce each and every term and condition of this Appointment.

21. That this Appointment and all its terms and conditions shall be governed by and interpreted under the laws of the State of New York.

App. II at 586-89. After issuing Pittsburg Pepsi the Pepsi-Cola EBA, PepsiCo offered

and Pittsburg Pepsi accepted EBAs for the following products: Teem (1960); Diet

5

Pepsi/Diet Pepsi-Cola (1964); Mountain Dew (1965); Sugar Free Teem (1965); Pepsi Light.Pepsi-Cola Light (1976); Diet Pepsi Free/Diet Pepsi-Cola Free (1982); Slice and Diet Slice (1985); Mug/Mug Old Fashioned Root Beer and Diet Mug/Diet Mug Old Fashioned Root Beer (1998); and Pepsi One (1998).[2]  In each successive EBA, Pittsburg Pepsi agreed not to sell another beverage in the same flavor category as the beverage specified in the EBA.  In most instances, Pittsburg Pepsi has also received a syrup appointment for the same product.

### *PepsiCo's move toward alignment*

PepsiCo has historically viewed the EBA, and specifically its grants of exclusive territories to its independent bottlers, as the core of its overall business structure.  In his August 14, 1975, testimony before the Federal Trade Commission, then-PepsiCo President Walter S. Mack discussed how PepsiCo used the promise of exclusivity to persuade independent businessmen to become PepsiCo bottlers:

> [W]e had to give them confidence in the early days that we were going to win our trademark suits and that they were taking on a beverage which they would have the exclusive right to from then on for the rest of their lives. . . . [We told the bottlers] that the parent company would protect their franchise, the terms and conditions of the franchise, and do everything we could to protect both the trademark and the name and their territory for them on an exclusive basis.

App. III at 1019-21.  Mack testified that PepsiCo told the bottlers they would have an exclusive franchise for the rest of their lives or in perpetuity.  On March 19, 1980,

---

[2] Although not identical, the subsequent EBAs include substantively the same provisions as the original Pepsi-Cola EBA.

PepsiCo's then vice president for corporate affairs, Cartha D. Deloach, testified before the House Subcommittee on Monopolies and Commercial Law on the Soft Drink Interbrand Competition Act of 1980 (Act), 15 U.S.C. § 3501, et. seq. Deloach claimed PepsiCo needed the Act's passage to protect its right to issue bottlers EBAs and syrup appointments covering exclusive territories. Deloach testified:

> If Exclusive Territories are eliminated, dozens and dozens of Pepsi-Cola bottlers will be driven out of business by their larger neighbors. This will be accomplished quickly through the ability of larger bottlers by virtue of their location in major areas and their bottling capacity to take the cream of the business . . . leaving smaller bottlers with less profitable accounts to service . . . . Long term, not only will there be fewer outlets handling soft drinks, but after the bottler ranks are decimated, the survivors, I am certain, will be able to raise soft drink prices higher than ever. . . .
> We totally support our bottlers in their efforts to preserve the Exclusive Territories we granted them because we are deeply grateful for their past and continuing commitment to their parent company and because we need such fiercely competitive partners in our future.

App. III at 1030-33.

PepsiCo subsequently acted in 1984 to protect the exclusive territories of its independent bottlers by instituting a vigorous no-fault transshipment enforcement program (TEP). Transshipment occurs when a product from one bottler is offered for sale in a territory for which another bottler has an EBA. Under the TEP, which remains in place today, if any bottler discovers Pepsi products manufactured by another bottler in its territory, the bottler can file a complaint with PepsiCo's Transshipment Department. If PepsiCo confirms that products came from another bottler, it can impose a charge for each case of transshipped beverage, to be paid to the bottler whose territory is violated

7

with the amount to be determined by PepsiCo. The TEP restrictions apply to all bottlers.

During the 1980s and 1990s, two significant changes occurred which directly affected PepsiCo's ability to successfully compete nationwide, and ultimately its relationship with its bottlers. First, significant consolidation occurred on the retail side of the soft drink industry as a result of the growth of large, nationwide retail chains like Wal-Mart and Sam's Club. PepsiCo's biggest customers had stores in multiple bottling territories and began demanding that PepsiCo service their needs at a national rather than a local level. Second, in the 1980's, PepsiCo's chief rival, the Coca-Cola Company (Coke) established a single anchor bottler, Coca-Cola Enterprises, and began acquiring its individual bottlers. This consolidation enabled Coke to benefit from the economy of scale and to negotiate more effectively with large retail chains.

PepsiCo initially tried to replicate Coke's success without eliminating its independent bottler network. As part of a strategy termed "alignment," PepsiCo developed a pair of contracts in the early 1990s: the customer development agreement (CDA) and the marketplace investment agreement (MIA). Operating together, these contracts enabled PepsiCo to use its independent bottlers to obtain nationwide market power. PepsiCo still uses both contracts today. The CDA is an agreement between PepsiCo and large retail chains. Under the CDA, PepsiCo agrees to provide financial incentives to the chain in exchange for a promise that the chain will pursue various marketing activities to increase sales of Pepsi products. In exchange, the chain receives a rebate for each case of Pepsi products purchased from its local bottler. PepsiCo and its

8

bottlers typically share the cost of these rebates pursuant to the MIA. Under the MIA, PepsiCo agrees to pay its independent bottlers to help offset marketing costs. In return, the independent bottlers agree to pay PepsiCo for their portion of the rebate costs as well as costs affiliated with national advertising campaigns. A bottler's ability to receive marketing funds from PepsiCo is thus conditioned on the bottler's willingness to participate in the retail-rebate system.

Although most bottlers sign the MIA and agree to pay their share of the costs under the CDAs, Pittsburg Pepsi has refused to sign the MIA.[3] By refusing to sign the MIA, Pittsburg Pepsi has avoided any contractual obligation to share the cost of the CDA rebates with PepsiCo. In return, PepsiCo has not provided Pittsburg Pepsi with the marketing funds that other independent bottlers receive when they sign the MIA. Nonetheless, to stay competitive with Coke, PepsiCo has fully paid the cost for CDAs and national advertising campaigns in Pittsburg Pepsi's territory.

In the late 1990s, PepsiCo began contemplating more aggressive steps to consolidate/align its bottler network. In November 1996, Pepsi's national executive team (NET) determined that, as part of its three-year strategic plan, it should focus on "system alignment" in order to "capture [a] competitive advantage from direct bottling system control while achieving cost parity with Coke." App. IV at 1278. The NET believed the

---

[3] Pittsburg Pepsi believes that because the CDA permits PepsiCo to determine the discount that national chains receive (and thus indirectly affects the price those chains ultimately pay for Pepsi products), the CDAs take away Pittsburg Pepsi's right under the EBA to price its product in its exclusive territory.

key barrier to achieving perfect alignment was the fact that "55 % of the bottling system[] has one unified decision point," in the form of one large-scale bottler controlled by PepsiCo and "45 % of the bottling system[] has 125 independent decision points" in the form of 125 individual bottlers. Id. at 1281. Thus, at a March 1997 meeting, PepsiCo considered aggressively buying back franchises and other tactical actions in order to "[a]ccelerate U.S. alignment through the creation of 4-6 anchor bottlers within the next 12 months." App. IV at 1716. Thereafter, PepsiCo began focusing on a specific strategy with respect to those independent bottlers who were not willing to participate in PepsiCo's business model. It is Pittsburg Pepsi's contention that the underlying goal of this business strategy was to eliminate those independent bottlers who did not participate in PepsiCo's business model. Id. at 1693. During this period, each bottler's "strategic importance" and "degree of alignment" were assessed. Bottlers viewed as being of low strategic importance and generally "unaligned" were to be invested in "only to prevent dysfunction" and were to receive "[m]inimum resourcing" and "[n]o system advantages." Id. at 1301.

At a March 1998 PepsiCo board of directors meeting, Indra K. Nooyi, PepsiCo's then senior vice president of corporate strategy and development, presented a competitive analysis of the Coca-Cola Company, focusing on Coke's acquisition of bottlers. Nooyi noted that in cases where an independent bottler failed to comply with Coke's demands, the bottler was "often met with [a] punitive response," including termination of its EBA. App. V at 1894. Nooyi further noted that in many markets where PepsiCo had as many

10

as five separate bottlers, Coke was servicing the same area with its single anchor bottler.

In early 1999, PepsiCo launched its bottler consolidation plan by implementing a few national "anchor bottlers" which reported directly to PepsiCo. Currently, PepsiCo has three anchor bottlers which account for 70-72 percent of Pepsi product volume in the United States. The largest of those anchor bottlers is defendant Bottling Group. Bottling Group existed as part of PepsiCo during the 1990s and was comprised of PepsiCo-owned bottling operations PepsiCo had acquired from independent bottlers who wanted to sell their franchises. In March 1999, PepsiCo entered into a master bottling agreement (MBA) with Bottling Group, granting Bottling Group the exclusive right to manufacture, sell, and distribute Pepsi products in all or a portion of 41 states, including areas to the west, south, and east of Pittsburg Pepsi's territory.

After implementing the anchor bottler network, PepsiCo turned its attention to acquiring or aligning its independent bottlers. According to Richard Lawrence, who serves as PepsiCo's vice president of franchise development and oversees its transshipment department, "[a]fter the anchor bottlers were created in 1999, it was expected that the anchor bottlers (rather than PepsiCo) would pursue future bottler acquisitions." App. XII at 4761. From 1999 until 2003, Bottling Group employed Lawrence to negotiate bottler acquisitions on its behalf and to help develop a bottler acquisition plan.

Concurrent with Bottling Group's plan to acquire independent bottlers, PepsiCo developed a plan to weaken some of its independent bottlers. On November 13, 2000,

11

PepsiCo's senior executive team met at PepsiCo's headquarters to ratify "[o]ur Approach with Unaligned Bottlers," an internal strategy that outlined six criteria PepsiCo used to determine whether a bottler was deemed in "non-compliance" with PepsiCo's objectives and should be classified as "unaligned."[4]  App. III at 1139.  Fourteen bottlers, including Pittsburg Pepsi, were classified as "unaligned."  PepsiCo proposed a particular "solution" for each unaligned bottler, which Pittsburg Pepsi contends had as its goal to force each bottler into the position of being a "potential acquisition candidate."  Id. at 1140-43.  The "solution" set forth for Pittsburg Pepsi was: "Withhold A&M to offset customer CDA commitments" and "not offered Mist or Dole appointments."  Id. at 1143.  PepsiCo decided to stop offering EBAs for new Pepsi products to most unaligned bottlers.  As a result, Pittsburg Pepsi was not offered EBAs for Sierra Mist, Diet Sierra Mist, FruitWorks, Dole, Mountain Dew Code Red, Pepsi Twist, or Diet Pepsi Twist.

### *Transshipment by third-party vendors*

Bottling Group is the largest transshipper in the PepsiCo system, paying $4,397,073 in transshipment fines and expenses in 1999, and $2,955,517 in 2000.  Pittsburg Pepsi through counsel has repeatedly complained to PepsiCo about Bottling Group's transshipment, sending Bottling Group letters on February 4, 1992, May 30,

---

[4] The six criteria used for determining lack of alignment were:  (1) failure to participate in national or regional CDAs; (2) failure to sign the fountain agreement and failure to allow open commissary deliveries in its territories; (3) refusal to sign and support the MIA; (4) failure to report monthly sales; (5) failure to compete vigorously in its marketplace; and (6) poor product quality and customer service.  Pittsburg Pepsi concedes it met the first four criteria, but disputes PepsiCo's conclusion that it has failed to compete vigorously in the marketplace.

1995, October 5, 1995, and on May 17, 1996. As a part of the present litigation, Pittsburg Pepsi's transshipment claim against Bottling Group pertains to three vendors.

First, Pittsburg Pepsi relies on Bottling Group's contacts with Grace Energy Corporation (Grace) to support its transshipment claims. Grace operates 39 convenience stores, three of which are in Pittsburg Pepsi's territory. According to Mike McDaniel, the director of Grace's convenience store division, Grace purchased fountain syrups from both Pittsburg Pepsi and Bottling Group for 18 years. At some point, McDaniel told Terry Sergeant, who worked for Bottling Group, that it was important that Grace deal with one company (i.e. bottler) for all of its needs. Sergeant assured McDaniel that Bottling Group could serve that purpose. According to McDaniel, Sergeant gave him the impression that Sergeant had the authority to speak on behalf of Pittsburg Pepsi. Thereafter, Grace began selling fountain syrups provided by Bottling Group in Pittsburg Pepsi's territory. Similarly, Wayne Gruenwald, Grace's director of corporate merchandising, stated that Sergeant, and Byron Brooks, Bottling Group's Missouri plant manager, told him that Bottling Group hoped to own Pittsburg Pepsi one day. According to Gruenwald, during syrup fountain negotiations, Bottling Group represented that it could cover all of Grace's needs, including those parts of Grace's business serviced by Pittsburg Pepsi. Gruenwald further stated that John Mehalic, Bottling Group's location unit manager in Missouri, knew that Grace was purchasing Pepsi products from a Sam's Club in Bottling Group's territory and transporting it into Pittsburg Pepsi's territory, but took no action to stop Grace.

13

The second major third-party vendor that has transshipped Pepsi products into Pittsburg Pepsi's territory is Southeast Kansas Vending (SEK). SEK is a full-service vending company in Girard, Kansas, which stocks soft drink vending machines in Pittsburg Pepsi's territory with Pepsi, Coke, and Cadbury product.

> From July 1, 1997 through the spring of 2002, SEK got 90 percent of its Pepsi product from Sam's Club in Joplin, Missouri, which buys from Bottling Group. From July 1997 through December 2001, SEK purchased 12,810 cases of Pepsi product from Sam's Club and 4,136 cases of Pepsi product from Food 4 Less (also Joplin), for resale in [Pittsburg Pepsi]'s territory.

App. XIX at 7684. Historically, PepsiCo has discussed with Sam's Club the issue of transshipment. As early as 1990, it appears the major soft-drink distributors were actively engaged in policing and limiting transshipment by third-party vendors seeking to purchase their products from Sam's Club.

> According to Lawrence, if somebody is buying 500 cases per month from Sam's Club, 'that's not going into the garage,' and that if a bottler knows that Sam's Club is selling that amount of product and it is ending up in another territory, the bottler would typically try to work something out to be sure that the product was not getting out of its territory. Also, . . . if a bottler has a third party vendor with outlets both inside and outside the bottler's territory, the bottler should make sure that the vendor did not sell the bottler's products into another bottler's territory.

Id.

Pittsburg Pepsi first complained about SEK's transshipment of Bottling Group's products in a November 22, 1999, letter to Bottling Group. On December 3, 1999, Bottling Group replied that "we have no knowledge or information as to whom [SEK] may be doing business with to obtain Pepsi-Cola products." App. XV at 6037. Pittsburg

14

Pepsi hired a private investigator who determined that SEK was purchasing products from the Sam's Club in Joplin, but apparently did not provide this information to Bottling Group. On January 17, 2000, Pittsburg Pepsi again complained to Bottling Group that SEK was transshipping Pepsi products into its territory. In response, Bottling Group "suggested that if Pittsburg Pepsi told Bottling Group the source of SEK product, it might be able to investigate the matter." App. XIX at 7684. Some time thereafter, "because of its transshipment policy or litigation involving Bottling Group and Pittsburg Pepsi, Sam's Club notified SEK that it could not purchase Pepsi product for resale in [Pittsburg Pepsi's] territory." Id. SEK has stopped purchasing Pepsi products from Sam's Club for resale.

The third major third-party vendor that has transshipped Pepsi products into Pittsburg Pepsi's territory is Smith Foods Vending (Smith). Smith is a Kansas corporation, headquartered in Joplin, Missouri, that offers vending and cafeteria services in Missouri, Oklahoma, and Kansas. Approximately 15 percent of its accounts are located in Pittsburg Pepsi's territory; the rest are in Bottling Group's territory. For several years, Smith purchased Pepsi products from both Bottling Group and Pittsburg Pepsi. In October 2000, Smith stopped purchasing Pepsi products from Pittsburg Pepsi because Smith believed Pittsburg Pepsi's prices were too high, and because Smith believed that Pittsburg Pepsi sold the same Pepsi products to Smith's competitors at a reduced price. Without informing Bottling Group, in October 2000, Smith began stocking its vending machines in Pittsburg Pepsi's territory with Pepsi products purchased

15

from Bottling Group. Although Smith understood it was transshipping, in its view, it was just trying to obtain Pepsi products at a fair price.

In the fall of 1999, Smith vice president Patricia Eggerman first spoke about transshipment with Laurie Lloyd, a Bottling Group sales representative. Sometime thereafter, Lloyd told Eggerman that if Smith was getting Pepsi products from Bottling Group and reselling them in Pittsburg Pepsi's territory, "it should stop." App. XIX at 7685. Since that conversation, Bottling Group has monitored Smith purchases and they have declined. C.L. Farabi, president of Pittsburg Pepsi, says he has continued to complain to Bottling Group about Smith's transshipment.

### *Procedural history*

Pittsburg Pepsi filed this action against PepsiCo and Bottling Group in the United States District Court for the District of Kansas.[5] In its initial complaint, Pittsburg Pepsi alleged violations of its EBA for regular Pepsi-Cola. Bottling Group moved to dismiss Pittsburg Pepsi's claims. The district court denied the motion. Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc., 175 F. Supp.2d 1288 (D. Kan. 2001).

Pittsburg Pepsi then filed a six-count second amended complaint, alleging: (1) PepsiCo breached the EBAs and the implied covenant of good faith and fair dealing because PepsiCo refused to extend new product appointments to Pittsburg Pepsi, and

---

[5] Pittsburg Pepsi originally filed suit against Pepsi and Beverage Products Corporation, a predecessor-in-interest to Bottling Group. Pittsburg Pepsi filed an amended complaint that substituted Bottling Group as the defendant and successor-in-interest to Beverage Products Corporation.

16

denied Pittsburg Pepsi funding and territorial protection from transshipment; (2) PepsiCo assumed and breached various fiduciary duties to protect Pittsburg Pepsi's territory; (3) Pittsburg Pepsi was a third-party beneficiary of PepsiCo's MIA with Bottling Group and Bottling Group's transshipment of PepsiCo products into Pittsburg Pepsi's territory violated Pittsburg Pepsi's third-party beneficiary rights; (4) Bottling Group tortiously interfered with Pittsburg Pepsi's contractual agreement with PepsiCo and both defendants tortiously interfered with Pittsburg Pepsi's relationships with its customers; (5) PepsiCo and Bottling Group engaged in a civil conspiracy and aided and abetted in a tort by attempting to drive Pittsburg Pepsi and other independent bottlers out of business; and (6) PepsiCo and Bottling Group violated the Kansas Restraint of Trade Act. All three parties filed motions for summary judgment on all claims.

The district court granted the defendants' motions for summary judgment as to all claims. Pittsburg Pepsi filed a Rule 59(e) motion to alter or amend the judgment, which the district court denied.[6]

## II.

### *Standard of review*

We review de novo a district court's grant of summary judgment, applying the same standard used by the district court. Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1326 (10th Cir. 1999). Summary judgment is

---

[6] Plaintiff has abandoned its claim under the Kansas Restraint of Trade Act, as well as its claim that defendants aided and abetted in the commission of a tort.

17

appropriate "if the pleadings . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The court views the record and draws all favorable inferences in the light most favorable to the non-moving party. McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1128 (10th Cir. 1998).

### Choice of law

This is a diversity action filed pursuant to 28 U.S.C. § 1332. In a diversity action, we apply the substantive law of the forum state, including its choice of law rules. See Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 495-97 (1941); New York Life Ins. Co. v. K N Energy, Inc., 80 F.3d 405, 409 (10th Cir. 1996). In this case, Kansas is the forum state. As to the contract-based claims, Kansas choice of law rules honor an effective choice of law by contracting parties. Brenner v. Oppenheimer & Co., 44 P.3d 364, 374 (Kan. 2002). As Pittsburg Pepsi's contract claims are premised on the EBAs, which state that the terms and conditions of the EBAs shall be governed and interpreted by New York law, New York law applies to Pittsburg Pepsi's breach of contract and third-party beneficiary claims. As to the claims sounding in tort (tortious interference, breach of fiduciary duty, and civil conspiracy), the parties agree the alleged injuries occurred in Kansas and that Kansas law applies to those claims. See Ling v. Jan's Liquors, 703 P.2d 731, 735 (Kan. 1985) (stating under Kansas choice of law rules, the applicable law for tort claims is the law of the state where the aggrieved party suffered injury).

18

***Breach of contract by PepsiCo***

Pittsburg Pepsi contends PepsiCo: (1) breached an express and implied-in-fact contract by failing to offer Pittsburg Pepsi new product appointments; (2) breached an express and implied-in-fact contract by failing to enforce the TEP against Bottling Group; and (3) breached the implied covenant of good faith and fair dealing. The district court concluded that PepsiCo was entitled to summary judgment because the EBAs did not obligate PepsiCo to offer Pittsburg Pepsi new products or to enforce the TEP. Further, finding no breach of the EBAs' express terms, the court granted PepsiCo summary judgment on Pittsburg Pepsi's corresponding claim that PepsiCo breached the implied covenant of good faith and fair dealing.[7]

---

[7] Before proceeding to the merits, we must first determine whether the Uniform Commercial Code (UCC) governs our interpretation of the EBAs. The parties did not raise this issue in district court. As a result, the district court appears to have assumed, without deciding, that the UCC applies. On appeal, PepsiCo now argues the UCC does not apply to the EBAs.

Under New York law, the UCC governs contracts for sales, but not services. A contract is one for "'service' rather than 'sales' when 'service predominates,' and the sale of items is 'incidental.'" Old Country Toyota Corp. v. Toyota Motor Distrib., Inc., 966 F. Supp. 167, 168 (E.D.N.Y. 1997) (quoting Triangle Underwriters, Inc. v. Honeywell Inc., 604 F.2d 737, 742 (2d Cir. 1979)). Conversely, a contract "must be considered one for sales when services are merely incidental or collateral to the sale of goods." Id. Applying these principles, New York courts have uniformly "ruled that [the UCC] applies to a dealership agreement." Id. Similarly, an overwhelming majority of other jurisdictions have held that distributorship contracts are sales contracts and thus governed by the UCC. See, e.g., Watkins & Son Pet Supplies v. The IAMS Co., 254 F.3d 607, 612 (6th Cir. 2001)("The majority rule is that distributorship contracts are sales contracts."); American Suzuki Motor Corp. v. Bill Kummer, Inc., 65 F.3d 1381, 1386 (7th Cir. 1995)(same).

In this case the EBA's purpose was to provide for and regulate PepsiCo's sale of products to Pittsburg Pepsi and Pittsburg Pepsi's resale of those items. While there are aspects of this agreement that make it a contract for services, in light of New York law

19

*Failure to offer EBAs for new products*

Pittsburg Pepsi contends that as a result of PepsiCo's past practice of offering Pittsburg Pepsi EBAs for new products, Pittsburg Pepsi has a contractual right to be offered EBAs for new Pepsi products.[8] Pittsburg Pepsi argues that the parties' 39-year course of dealing modified the original Pepsi-Cola EBA to include a provision entitling Pittsburg Pepsi to be offered appointments for new Pepsi products. Relevant to this claim, New York law places two limitations on the use of course of performance to establish contract modification. N.Y. U.C.C. 2-208(3) (stating "course of performance shall be relevant to show . . . modification," "[s]ubject to the [UCC's] provisions" on modification). First, if the original contract is "[a] signed agreement which excludes modification or rescission except by a signed writing," New York law prohibits modifying or rescinding that contract without a signed writing that conforms to the statute of frauds. N.Y. U.C.C. § 2-209(2), (3). Second, New York law prohibits course of performance evidence unless "the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other." Id., § 2-208(1) (2003).

---

relating to distributorships, we cannot conclude those aspects of the contract predominate the sales aspects. We therefore apply the UCC to analyze the contract claims at bar.

[8] Notably, following the district court's opinion, PepsiCo offered (and Pittsburg Pepsi accepted) appointments for the new Pepsi products which underlie this claim. See Aplt Br. at 18 n.5; see also App. XX 8112-23. We conclude this fact does not moot Pittsburg Pepsi's claim because Pittsburg Pepsi may still recover damages for any injury it sustained in the 21-month period it was not offered the EBAs for new products.

20

Applying New York law to the parties' contract and subsequent actions, we are unable to modify the original EBA based on the parties' course of performance to now require that PepsiCo offer Pittsburg Pepsi appointments for new Pepsi products. The original Pepsi-Cola EBA requires that any modification of the agreement must be in writing and agreed to by the parties. It states that "this Appointment expresses fully the understanding, and that all prior understandings are hereby cancelled, and no future changes in the terms of this Appointment shall be valid, except when and if reduced to writing and signed by both the Bottler and the Company, by legally authorized officials." App. I at 589. Here, Pittsburg Pepsi provides no evidence of a signed writing that modified the terms of the original Pepsi-Cola EBA. Nor has Pittsburg Pepsi presented any authority to establish that the contract modification, resulting in a contract for more than $500 and lasting into apparent perpetuity, would not be barred by the statute of frauds. Instead, Pittsburg Pepsi cites several cases holding that the parties' course of performance waived the terms of their original contract. In those cases, however, the courts relied on N.Y. U.C.C. § 2-208(1) to conclude that the parties' contract was modified where there was one contract which the delivering party repeatedly altered without objection by the receiving party. See Hyosung Am., Inc. v. Sumagh Textile Co., 137 F.3d 75, 80 (2d Cir. 1998) (holding because purchaser accepted three shipments of nonconforming goods without objection, it acquiesced in accepting future shipments of same nonconforming goods and could not refuse to pay for future nonconforming goods); Pepsi-Cola Bottling Co. of Asbury Park v. PepsiCo, Inc., 297 A.2d 28, 33 (Del. 1972)

21

(holding if the parties contractually agreed on a price, but one party began changing the price and the other repeatedly paid that price, neither party could seek to enforce the agreed-upon price because they had acquiesced to a change in the course of performance). Pittsburg Pepsi's contract modification claim differs from these cases because here, the parties' repeated actions did not modify an existing contract entitling Pittsburg Pepsi to any new products; rather, the parties entered into successive contracts, each entitling Pittsburg Pepsi to additional contracted-for products. These successive contracts are legally distinct agreements, not modifications of the original EBA. We conclude the district court correctly granted PepsiCo summary judgment on Pittsburg Pepsi's "contract modification by course of dealing" claim.

Relying on the same course of performance evidence, Pittsburg Pepsi argues that PepsiCo's repeated decision to offer Pittsburg Pepsi bottling rights to new products created an "implied-in-fact" contract entitling Pittsburg Pepsi to be offered new products. The district court ruled in PepsiCo's favor on this claim, concluding Pittsburg Pepsi's alleged "implied agreement fails for lack of consideration." We agree with the district court's conclusion, but we reach that conclusion by applying a different analysis. See Perry v. Woodward, 199 F.3d 1126, 1141 n.13 (10th Cir. 1999) (noting appellate court may affirm for any reason supported by the record).

Under New York law, theories of express contract and a contract implied in fact are mutually exclusive: a contract cannot be implied in fact where an express contract covers the subject matter involved. The logic underlying this rule has been explained as

22

follows:

> [Implied-in-fact] contracts arise in the absence of an express agreement and are based on the conduct of the parties, from which a fact finder may fairly infer the existence and terms of a contract. But the prerequisite for such a contract is that *there be no express agreement dealing with the same subject matter*. Where, as here, there is an express agreement covering the subject matter of the alleged implied-in-fact agreement, the implied-in-fact agreement is precluded as a matter of law. The logic at work here is obvious: If the parties have an express contract that deals with a subject, it makes little sense to conclude that they in fact agreed to additional terms but simply decided to leave them out of the express contract. Indeed, the merger clause in the agreement in this case bears out that logic.

Radio Today, Inc. v. Westwood One, Inc., 684 F. Supp. 68, 71 (S.D.N.Y. 1988) (internal citations omitted). Additionally, although New York law permits a prior course of dealing to interpret *existing* contracts, "[a] prior course of dealings . . . may not be used to establish contract formation." Fasolino Foods Co. v. Banca Nationale Del Lavoro, 761 F. Supp. 1010, 1021 (S.D.N.Y. 1991).

In the present case, it is clear that Pittsburg Pepsi's proposed implied-in-fact contract, guaranteeing it a right to successive EBAs on new products, would cover the same subject-matter that the parties have already reduced to writing on at least fourteen separate occasions. Further, to the extent Pittsburg Pepsi believes the subject matter of the implied contract would somehow be different from the existing contracts, New York law does not permit the creation of an implied contract from a prior course of dealing. We conclude Pittsburg Pepsi's implied-in-fact contract claim must fail as a matter of law.

23

*Failure to enforce the TEP*

We next consider Pittsburg Pepsi's assertion that PepsiCo breached the EBA by failing to enforce the TEP. The district court concluded the EBA's exclusive dealing clause did not obligate PepsiCo to enforce the TEP. As such, since the EBA did not explicitly mention the TEP elsewhere, the court analyzed whether the parties' course of dealing had modified the existing EBAs or implied a new term into the EBAs, requiring PepsiCo to enforce the TEP. The court concluded "the EBAs . . . do not obligate PepsiCo to protect plaintiff's territory from transshipment." App. XIX at 7709. On appeal, Pittsburg Pepsi argues the district court's narrow interpretation of the EBA misses the point – by agreeing to make Pittsburg Pepsi the exclusive dealer of Pepsi products, Pittsburg Pepsi contends PepsiCo is contractually obligated to prevent transshipment.

Under the UCC, "the meaning of the agreement of the parties is to be determined by the language used by them and by their action, read and interpreted in the light of commercial practices and other surrounding circumstances." N.Y. U.C.C. § 1-205, cmt. 1. Terms of a written agreement "may be explained or supplemented by course of dealing or usage of trade or by course of performance." N.Y. U.C.C. § 2-202(a). In analyzing the obligations and rights the exclusive dealings clause imposed, we may consider post-contract conduct because such conduct is the most persuasive evidence of the parties' intentions. See N.Y. U.C.C. § 2-208, cmt. 1.

The key question here is whether the scope of PepsiCo's obligations under the EBA included an obligation to enforce the TEP. The EBA states that PepsiCo contracted

24

for Pittsburg Pepsi to be the "exclusive bottler, to bottle and distribute" the agreed-upon Pepsi products. App. II at 586. Beginning with the initial EBA and in each EBA thereafter, PepsiCo has reiterated Pittsburg Pepsi's exclusivity rights and has publicly stated that the promise of exclusivity was the most compelling reason for an independent bottler to sign with PepsiCo. PepsiCo has stated in a complaint filed against an independent bottler that:

> To protect the bottler's continuing investment and to encourage the bottler to fully develop its business, PepsiCo appoints each bottler to an exclusive territory to the exclusion of all other bottlers and, except for certain national syrup accounts, *protects the bottler from competition from PepsiCo itself.* Each PepsiCo bottler . . . enjoys these same benefits *and protection* under the terms of its exclusive bottling appointment.

App. XIV at 5576 (emphasis added). In consideration of the right to be the exclusive dealer and the benefits attending that right, Pittsburg Pepsi and other independent bottlers agreed to do several things, including aggressively marketing PepsiCo products and not distributing competing beverages. One of the specific steps PepsiCo took to protect the exclusive rights granted to Pittsburg Pepsi under its original EBA was to create the transshipment enforcement program (TEP) and its Transshipment Department to enforce the program. The main responsibility of the Transshipment Department is to investigate and fine transhipping. Id. at 5896.

Moreover, although Pittsburg Pepsi has stated a separate claim for breach of the implied duty of good faith and fair dealing, under New York law "breach of that duty is merely a breach of the underlying contract." Harris v. Provident Life & Acc. Ins. Co.,

25

310 F.3d 73, 80 (2d Cir. 2005) (internal quotation marks omitted), and this duty strongly reinforces Pittsburg Pepsi's transshipment claim. The covenant of good faith and fair dealing forbids a party to "do anything which will have the effect of destroying or injuring the right of the other party to review the fruits of the Contract." 511 West 232nd Owners Corp. v. Jennifer Realty Co., 773 N.E.2d 496, 500 (N.Y. 2002) (internal quotation marks omitted). Transshipments could undermine the value of Pittsburg Pepsi's exclusive franchise. If, for example, Pittsburg Pepsi's present and potential customers decided to buy all their product from a Sam's Club outside Pittsburg Pepsi's territory, Pittsburg Pepsi's franchise would become worthless. Accordingly, PepsiCo must refrain from conduct that creates an unreasonable risk that it will generate transshipments into Pittsburg Pepsi's territory unless it also polices the matter to deter transshipments.

We conclude – based both on the original EBA's text, parties' subsequent actions, and the implied covenant of good faith and fair dealing – that PepsiCo had a duty to take reasonable steps to prevent competing bottlers from encroaching on Pittsburg Pepsi's exclusive territory.

The more difficult question is whether there is sufficient evidence to create a question of material fact that PepsiCo did not protect Pittsburg Pepsi's territory. PepsiCo's alleged failure to enforce the TEP becomes relevant at this juncture. That is, although the EBAs do not mention the TEP, evidence that PepsiCo failed to enforce the TEP, while simultaneously taking no other action to prevent transshipment, would tend to

26

prove that PepsiCo failed to perform its contractual obligations. See So. Implement Co. v. Deere & Co., 122 F.3d 503, 507 (8th Cir. 1997) (concluding summary judgment improperly granted to supplier where contract did not grant distributor exclusive territory, because distributor's general rights under contract coupled with parties' long course of performance could support jury finding that distributor had exclusive rights which supplier was required to enforce).[9]

Here, Pittsburg Pepsi has presented several facts which pertain to PepsiCo's alleged failure to protect Pittsburg Pepsi's right to territorial exclusivity. First, and most damaging to PepsiCo, is the evidence relating to Lawrence. Until 2002, Lawrence appeared on both PepsiCo and Bottling Group's payrolls, simultaneously serving as PepsiCo's vice president of franchise development and transshipment enforcement director, and Bottling Group's point person for bottler acquisition. Thus, while Lawrence was working on PepsiCo's behalf to help independent bottlers grow and develop, he was leading Bottling Group's efforts to acquire dysfuctional bottlers. There is no dispute that PepsiCo had classified Pittsburg Pepsi as a dysfunctional bottler and that PepsiCo had decided it would "invest [in Pittsburg Pepsi] only to prevent dysfunction." App. IV at 1301. One could thus infer from these facts that PepsiCo had little interest in protecting

---

[9] As the Eighth Circuit further explained:
[A] jury could find that once [the supplier] was informed that a dealer was operating any unauthorized facility in another dealer's [territory], [the supplier] had a duty to investigate, and, if necessary, to prevent the dealer from operating the unauthorized facility by the same mechanisms [the supplier] would use to prevent other unauthorized dealer activity.
122 F.3d at 507.

Pittsburg Pepsi's territory, which PepsiCo admittedly was working to acquire.

Second, PepsiCo made several decisions which had the effect of encouraging Pittsburg Pepsi's customers to purchase Pepsi product from sources outside Pittsburg Pepsi's territory. While PepsiCo targeted unaligned bottlers, it simultaneously used the CDAs and MIAs to increase sales to major national chains such as Sam's Club. PepsiCo then worked with its anchor bottlers (including Bottling Group) to develop business with these national chains. Thus, as PepsiCo nationalized its marketing strategy and moved toward alignment, Pittsburg Pepsi's customers began going to Bottling Group's territory to obtain (and transship) discounted Pepsi products from national customers. From these facts, one could infer that PepsiCo created incentives for Pittsburg Pepsi's customers to purchase product from large chains, but then took inadequate steps to police the anticipated transshipment that followed. Finally, Pittsburg Pepsi repeatedly complained to PepsiCo about transshipment. It is unclear the extent to which PepsiCo responded to these complaints or whether it made any effort to train Bottling Group employees to prevent transshipment.

Viewing this evidence in a light most favorable to Pittsburg Pepsi, we believe a jury could conclude that PepsiCo knew transshipment was occurring and, despite promising to make Pittsburg Pepsi the exclusive PepsiCo dealer, chose to permit the transshipment with the hope of weakening the franchise of a dysfunctional bottler. We therefore conclude the EBAs required PepsiCo to protect Pittsburg Pepsi's territory, but that a question of material fact remains as to whether PepsiCo breached the EBAs'

28

exclusivity clause by not protecting Pittsburg Pepsi's rights as an exclusive dealer.

*Implied covenant of good faith and fair dealing*

Pittsburg Pepsi's final breach of contract claim is that PepsiCo breached the covenant of good faith and fair dealing implied in the EBAs. Pittsburg Pepsi contends PepsiCo breached this covenant by: (1) refusing to offer Pittsburg Pepsi EBAs for new products; (2) failing to adequately enforce Pittsburg Pepsi's right to be the exclusive dealer of Pepsi products in its defined territory; and (3) engaging in discriminatory wholesale pricing and withholding discounts.

Under New York law, every contract carries with it an implied duty of good faith and fair dealing. Dalton v. Educ. Testing Serv., 663 N.E.2d 289, 291 (N.Y. 1995). "This covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." 511 West 232nd Owners Corp., 773 N.E.2d at 500 (internal quotation omitted). "Where the contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion." Dalton, 663 N.E.2d at 291. "Encompassed within the implied obligation of each promisor to exercise good faith are any promises which a reasonable person in the position of the promisee would be justified in understanding were included." Id. (internal quotation omitted). "The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits

29

under their agreement." Don King Prod., Inc. v. Douglas, 742 F. Supp. 741, 767 (S.D.N.Y. 1990).

The implied duty of good faith and fair dealing is not without limitation. It "does not provide a court carte blanche to rewrite the parties' agreement," and "the mere exercise of one's contractual rights, without more, cannot constitute . . . a breach" of the implied covenant of good faith and fair dealing. Hartford Fire Ins. Co. v. Federated Dep't Stores, Inc., 723 F. Supp. 976, 991 (S.D.N.Y. 1989) (internal quotation omitted). Rather, "it simply ensures that parties to a contract perform the substantive, bargained-for terms of their agreement and that parties are not unfairly denied express, explicitly bargained for benefits." Don King Prod., 742 F. Supp. at 767 (internal quotation omitted).

Additionally, courts are not "at liberty to impose obligations under the guise of the implied covenant which are inconsistent with the terms of the contract from which the covenant is to be implied." In re Minpeco, USA, Inc., 237 B.R. 12, 26 (S.D.N.Y. 1997). Thus, "[a] party which acts in accordance with rights expressly provided in a contract cannot be held liable for breaching an implied covenant of good faith." Id. at 26. "The plaintiff can maintain its claim for breach of the implied covenant of fair dealing 'only if it is based on allegations different than those underlying the accompanying breach of contract claim.'" Concesionaria DHM, S.A. v. Int'l Fin. Corp., 307 F. Supp. 2d 553, 564 (S.D.N.Y. 2004) (internal quotation omitted). New York courts therefore routinely dismiss claims for breach of an implied covenant of good faith and fair dealing as "redundant since a breach of an implied covenant of good faith and fair dealing is

30

intrinsically tied to the damages allegedly resulting from a breach of the contract." OHM Remediation Servs. Corp. v. Hughes Envtl. Sys., Inc., 952 F. Supp. 120, 125 (N.D.N.Y. 1997) (internal quotation omitted).

We conclude that PepsiCo did not breach the implied covenant of good faith and fair dealing by failing to offer Pittsburg Pepsi EBAs for new Pepsi products. As we have noted, nothing in the existing EBAs entitled Pittsburg Pepsi to be offered subsequent EBAs. Nor did the parties enter into a general franchise agreement entitling Pittsburg Pepsi to all PepsiCo products. Rather, the parties agreed, through a series of individual EBAs, that Pittsburg Pepsi would be the sole bottler and distributor of the contracted-for Pepsi product. To read the EBAs as impliedly requiring PepsiCo to offer Pittsburg Pepsi EBAs for all new Pepsi products in perpetuity would impose additional obligations on PepsiCo beyond what a reasonable person would expect. To expand the existing EBAs to imply this additional covenant would be contrary to New York law. See Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 531 (S.D.N.Y. 2001)(stating "the duty of good faith cannot be used to create independent obligations beyond those agreed upon and stated in the express language of the contract").

As regards Pittsburg Pepsi's claim that PepsiCo violated the implied covenant by denying it territorial protection and failing to enforce the TEP, this claim was addressed earlier and is encompassed within Pittsburg Pepsi's breach of the EBA's exclusive dealing clause. In support of this allegation, Pittsburg Pepsi principally relies on two facts: PepsiCo's decision to encourage Bottling Group to become partners with major

31

third-party vendors (regardless of the transshipment consequences) and PepsiCo's decision to ignore Pittsburg Pepsi's transshipment complaints. These are the same facts that support Pittsburg Pepsi's assertion that PepsiCo breached the EBAs by failing to protect Pittsburg Pepsi's right to territorial exclusivity.

Finally, we must rule in PepsiCo's favor on Pittsburg Pepsi's claim that PepsiCo breached the implied covenant of good faith and fair dealing by failing to give Pittsburg Pepsi advertising funds and other financial support. Pittsburg Pepsi argues that PepsiCo has used the CDAs to reduce the price its largest customers pay (by providing those customers with rebates) while simultaneously using the MIAs to penalize those independent bottlers that refuse to contribute to the rebates (by refusing to provide those bottlers with marketing funds). Through this scheme, Pittsburg Pepsi contends "PepsiCo uses funding as a tactic to extract CDA 'compliance' when it knows this violates bottlers' fundamental pricing (and discounting) relationships within their own territories." Aplt. Br. at 67. According to Pittsburg Pepsi, these actions violate the "implied covenant of good faith and fair dealing to provide plaintiff with an opportunity to receive ordinary bottler funding from concentrate revenues." Id. Although Pittsburg Pepsi speculates "[t]here are many discretionary funds regularly paid by PepsiCo to its bottlers, and those funds are tied – at least on their face – to different programs," the only such funds referenced in the record are the advertising funds available under the MIA. Id.

To determine whether PepsiCo's failure to give Pittsburg Pepsi advertising funds violated an implied covenant of good faith and fair dealing, our analysis again begins

32

with the source of this proposed covenant – the text of the EBA. The original EBA states that Pittsburg Pepsi:

> *must fully cooperate in and vigorously push the Company's cooperative advertising and sales promotion programs and campaigns for the Territory.* In addition the Bottler will actively advertise, in all reasonable media including adequate point-of-purchase advertising, and vigorously engage in sales promotions of, bottled Pepsi-Cola throughout the Territory *at his own cost and expense*.

App. II at 587 (emphasis added). As we read this provision, Pittsburg Pepsi was required to (1) promote PepsiCo's sales promotion programs, and (2) pay for its own advertising costs. Because Pittsburg Pepsi assumed these contractual obligations, we cannot expand the implied covenant to hold PepsiCo liable for failing to provide Pittsburg Pepsi advertising funds.

### *Tortious interference by Bottling Group and PepsiCo*

We next consider Pittsburg Pepsi's claim that Bottling Group and PepsiCo tortiously "interfer[ed] with Pittsburg Pepsi's advantageous business relationship with its customers and prospective customers located in the Pittsburg Territory." App. II at 540.[10]

---

[10] In its Second Amended Complaint, Pittsburg Pepsi included a separate claim against Bottling Group for "intentionally inducing the violation of Pittsburg Pepsi's contractual rights" with PepsiCo. App. II at 540. On appeal, however, Pittsburg Pepsi does not set out the requisite legal elements to succeed on a tortious interference with contractual relations claim and instead focuses solely on the elements needed to prove tortious interference with a current or prospective business advantage. Additionally, rather than arguing that Bottling Group tortiously interfered with Pittsburg Pepsi's and PepsiCo's contractual relations, Pittsburg Pepsi now claims that Bottling Group and PepsiCo were jointly involved in one tortious interference scheme. Although we are inclined to conclude Pittsburg Pepsi has waived its tortious interference with contractual rights claim, we nevertheless conclude on the merits that Bottling Group is entitled to summary judgment on the claim.

33

To prevail on a claim for tortious interference with current or prospective business advantage under Kansas law, Pittsburg Pepsi must show

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate result of defendant's misconduct.

PulseCard, Inc. v. Discover Card Servs., Inc., 917 F. Supp. 1488, 1498 (D. Kan. 1996). To establish a tortious interference claim, a plaintiff must show that defendant acted with malice. L&M Enters., Inc. v. BEI Sensors & Sys. Co., 231 F.3d 1284, 1288 (10th Cir. 2000). In Kansas, malice is defined as acting with "actual evil-mindedness or specific intent to injure." Turner v. Halliburton Co., 722 P.2d 1106, 1113 (Kan. 1986).

The district court concluded that Pittsburg Pepsi's tortious interference claim failed on the third prong of the analysis because defendants' actions were not the "but for" cause for Pittsburg Pepsi's customers purchasing product from others. App. XIX at 7735. With regard to the fourth prong, the court determined "the record contains no evidence of

---

To recover on a tortious interference with a contract claim under Kansas law, a plaintiff must prove (1) the existence of a contract; (2) Bottling Group's knowledge thereof; (3) its intentional procurement of a breach; (4) the absence of justification; and (5) damages resulting therefrom. Dickens v. Snodgrass, Dunlap & Co., 872 P.2d 252, 257 (Kan. 1994). Applying these elements, the district court granted Bottling Group's motion for summary judgment, concluding there was no evidence that Bottling Group had induced PepsiCo to breach the EBAs. We similarly find no evidence that Bottling Group procured PepsiCo's breach of the EBA. To the contrary, Pittsburg Pepsi's theory was that PepsiCo encouraged Bottling Group to take actions detrimental to Pittsburg Pepsi. Because Pittsburg Pepsi has not established that Bottling Group intentionally procured a breach, we conclude summary judgment was properly granted.

34

malicious intent." Id. at 7736. Like the district court, we conclude Pittsburg Pepsi has established the first and second prongs – it is clear that Pittsburg Pepsi had established relationships with its customers and that both defendants knew about the relationships. Additionally, we conclude that, because there is evidence that third-party vendors purchased products from Bottling Group instead of Pittsburg Pepsi and that Pittsburg Pepsi incurred losses, if Pittsburg Pepsi has presented evidence giving rise to a question of material fact as to the third and fourth elements, summary judgment was improperly granted. We therefore focus our inquiry on the third and fourth tortious interference elements and separately review the evidence as it pertains to Bottling Group and PepsiCo.

*Bottling Group*. Pittsburg Pepsi's toughest hurdle on its tortious interference claim is to show that, except for each defendant's conduct, Pittsburg Pepsi was reasonably certain to have continued a business relationship or realized the expectancy of a business relationship with a customer. Although this is a difficult element to prove, when viewing the evidence in a light most favorable to Pittsburg Pepsi, we conclude Pittsburg Pepsi has presented sufficient evidence to withstand summary judgment on the tortious interference claim against Bottling Group as regards its claim involving SEK.

The evidence pertaining to Bottling Group's involvement with SEK suggests that Bottling Group's actions encouraged SEK to tranship into Pittsburg Pepsi's territory rather than purchase Pepsi products from Pittsburg Pepsi. Here, the evidence reflects that over a five-year period spanning from 1997 to 2002, SEK used its registered account at Sam's Club in Joplin, Missouri, to purchase approximately 90 percent of its Pepsi

35

products for resale in Pittsburg Pepsi's territory. App. XIX at 7684. According to Lawrence, these continued purchases of large quantities of products should have triggered an investigation into SEK's possible resale of the product. Id. During this period, Pittsburg Pepsi repeatedly complained to Bottling Group about SEK's transshipment, but Bottling Group stated it had no knowledge of the transshipment. Id.; App XV at 6037. However, as early as 1990, the major soft-drink distributors were actively engaged in limiting transshipment through large stores like Sam's Club. Although Bottling Group may be able to establish it had no knowledge of the extent to which SEK was purchasing products from Sam's Club, we cannot reach that conclusion on the record before us. We conclude Pittsburg Pepsi has proven that a question of material fact remains as to whether Pittsburg Pepsi would have obtained SEK's business but for Bottling Group's actions. Similarly, as to the fourth element of a tortious interference claim, we conclude a jury could interpret the foregoing evidence as evidence of Bottling Group's intent to take Pittsburg Pepsi's customers. We therefore reverse the district court's grant of summary judgment to Bottling Group on Pittsburg Pepsi's tortious interference claim against Bottling Group as regards SEK.

*PepsiCo*. Pittsburg Pepsi's tortious interference claim against PepsiCo presents a closer question. Pittsburg Pepsi claims that PepsiCo's long-term business plan, administrative structure, and failure to enforce the TEP collectively equate to tortious interference. To determine whether Pittsburg Pepsi has proven that a question of material fact remains on this claim, we again examine whether there is evidence (1) that, but for

36

PepsiCo's conduct, Pittsburg Pepsi was reasonably certain to continue its customer relationships or realize an expectancy of future business, and (2) of intentional misconduct by PepsiCo.

Pittsburg Pepsi relies on three sets of facts to establish that PepsiCo's conduct caused it to lose current and prospective business. First, Pittsburg Pepsi again focuses extensively on the fact that Lawrence was jointly involved in bottler development (for PepsiCo) and bottler acquisition (for Bottling Group). Second and relatedly, Pittsburg Pepsi relies on PepsiCo's decision to expand the sale of its products at discounted rates to major retailers while simultaneously failing to enforce its transshipment policies. Pittsburg Pepsi alleges these actions were part of PepsiCo's larger plan to drive the independent bottlers out of business. Third, Pittsburg Pepsi seeks to hold PepsiCo responsible for any tortious actions taken by Bottling Group based on its theory that Bottling Group was acting on PepsiCo's behalf in effectuating PepsiCo's long-term plan to reduce the number of bottlers.

We note that Pittsburg Pepsi has provided no evidence that PepsiCo *directly* interfered with Pittsburg Pepsi's business. Instead, Pittsburg Pepsi asks us to infer that, because PepsiCo created a climate which made it possible for Pittsburg Pepsi's customers to purchase products from another bottler, PepsiCo should be held liable for *intentionally causing* Pittsburg Pepsi's customers to purchase from others. Further, Pittsburg Pepsi asks us to conclude, consistent with the third element of a tortious interference claim, that this climate was the *but for* cause of its loss of business.

37

However, absent evidence that PepsiCo's conduct caused Pittsburg Pepsi's customers to purchase products from another bottler at a cheaper price, PulseCard, 917 F. Supp. at 1498, Pittsburg Pepsi cannot survive PepsiCo's summary judgment motion on Pittsburg Pepsi's tortious interference claim. We therefore conclude the district court properly granted PepsiCo summary judgment on Pittsburg Pepsi's tortious interference claim.

### *Third-party beneficiary claim*

Pittsburg Pepsi claims that Bottling Group's transshipment breached the clause in the MBA and the pre-anchor EBAs between PepsiCo and Beverage Products Corporation (Bottling Group's predecessor) in which Bottling Group promised PepsiCo it would not sell Pepsi products outside Bottling Group's territory. Pittsburg Pepsi is not a party to the MBA or the EBAs between PepsiCo and Beverage Products Corporation, but contends it can nevertheless enforce the agreements as a third-party beneficiary. The district court determined that Pittsburg Pepsi was not a third-party beneficiary to any of Bottling Group's agreements with PepsiCo and granted Bottling Group's motion for summary judgment on Pittsburg Pepsi's third-party beneficiary claim.

Under New York law, "only an intended beneficiary of a contract may assert a claim as a third-party beneficiary." Mortise v. United States, 102 F.3d 693, 696 (2d Cir. 1996). A third party is an intended beneficiary where (1) no one other than the third party can recover if the promisor breaches the contract, *or* (2) the language of the contract otherwise clearly evidences an intent to permit enforcement by the third party. Piccoli A/S v. Calvin Klein Jeanswear Co., 19 F. Supp. 2d 157, 162 (S.D.N.Y. 1998). "Although

38

a party need not necessarily be specifically mentioned in a contract to be considered a third-party beneficiary, the parties' intention to benefit the third party nonetheless must be revealed on the face of the agreement." Id. at 163 (internal quotation omitted). A plaintiff "must plead facts to establish that it is an 'intended' beneficiary of a contract and not merely an 'incidental' beneficiary." Flack v. Friends of Queen Catherine Inc., 139 F. Supp. 2d 526, 538 (S.D.N.Y. 2001).

Pittsburg Pepsi's third-party beneficiary claim fails under the first test. Both the MBA and the EBA plainly permit someone other than Pittsburg Pepsi to recover if Bottling Group breaches the contract. The MBA states in paragraph 16(b) that "[i]n addition to all other remedies [PepsiCo] may have against any Transhipping Bottler" for violating the transshipment provisions, PepsiCo can recover from Bottling Group specified transshipment charges. App.Vol. II at 689. Similarly, the EBA provides that PepsiCo, "in addition to all other rights and remedies, including [its] right to damages sustained," may terminate the Appointment if certain designated events occur. Id. at 588.

Pittsburg Pepsi's third-party beneficiary claim fares no better under the second test. The MBA's text contains no proof that the parties intended that Pittsburg Pepsi (or any third party) retain the right to enforce the agreement. Moreover, the parties' practice fails to evince such an intent. Rather, when a third-party bottler suspects transshipment, the record reveals the normal practice is for the third-party bottler to report the alleged transshipment to PepsiCo who, in turn, enforces the MBA's anti-transshipment provisions. Pittsburg Pepsi repeatedly followed this practice. As a result, of course,

39

Pittsburg Pepsi *incidentally benefitted* from the MBA because Pittsburg Pepsi's territory was protected, but that incidental benefit alone does not confer a right to enforce the MBA. Likewise, Pittsburg Pepsi's third-party beneficiary claim premised on the EBA also fails. Again, the EBA contains no language suggesting the parties intended to confer upon a third-party bottler a right to recover for a breach of another bottler's contract with PepsiCo. We therefore conclude that under New York law, Pittsburg Pepsi is not an intended beneficiary of either the MBA or the EBA and that the district court properly granted Bottling Group summary judgment on Pittsburg Pepsi's third-party beneficiary claim.

### *Breach of fiduciary duty by PepsiCo*

Pittsburg Pepsi also claims PepsiCo breached certain fiduciary duties by (1) failing to fairly and fully enforce its transshipment program; (2) failing to consider the best interest of bottlers in CDA negotiations; (3) undercutting Pittsburg Pepsi's right to determine prices and other terms of territory product sales; and (4) retaliating against Pittsburg Pepsi by withholding new products and funding because of Pittsburg Pepsi's refusal to participate in the CDAs. The district court concluded that Pittsburg Pepsi failed to show that PepsiCo owed it any fiduciary duties and granted PepsiCo's motion for summary judgment.

Kansas law recognizes two types of fiduciary relationships: (1) those specifically created by contract or by formal legal proceedings, and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties

40

to each other and to the questioned transactions. Rajala v. Allied Corp., 919 F.2d 610, 614 (10th Cir. 1990) (citing Denison State Bank v. Madeira, 640 P.2d 1235, 1241 (Kan. 1982)). Here, as in Rajala and Denison, because there is no evidence that a fiduciary duty was created by a contract or formal legal proceedings, the only question remaining is whether the facts presented support an implied fiduciary duty.

Determination of whether a court should imply a fiduciary relationship "depends on the facts and circumstances of each individual case." Denison, 640 P.2d at 1241. The Kansas Supreme Court has set forth certain broad principles for courts to apply in making this determination:

> A fiduciary relationship imparts a position of peculiar confidence placed by one individual in another. A fiduciary is a person with a duty to act primarily for the benefit of another. A fiduciary is in a position to have and exercise, and does have and exercise influence over another. A fiduciary relationship implies a condition of superiority of one of the parties over the other. Generally, in a fiduciary relationship, the property, interest or authority of the other is placed in the charge of the fiduciary.

Id. Additionally, the Kansas Supreme Court has stated that "conscious assumption of the alleged fiduciary duty is a mandatory element under Kansas law." Rajala, 919 F.2d at 615. Kansas courts have not addressed whether a distributorship or franchise relationship creates fiducial obligations. Applying the holdings in Denison to the facts presented, we must therefore predict how Kansas' highest court would rule on this question. See Vanover v. Cook, 260 F.3d 1182, 1186 (10th Cir. 2001) (noting "[i]n the absence of definitive direction from the highest court of the state of Kansas, we must predict the course that body would take if confronted with the issue").

41

In Pizza Management, Inc. v. Pizza Hut, Inc., 737 F. Supp. 1154, 1183 (D. Kan. 1990), the court applied Denison to determine "whether Kansas law would recognize a franchise relationship to implicate fiducial obligations and, if not, then whether the facts and circumstances between the parties could justify implying a fiducial relation." The court explained:

> The franchisor -- franchisee relationship is an arms-length, commercial one with the performance of each governed and regulated by the typically exhaustive terms of written franchise agreements. It is the very nature of franchising that both parties enter into their agreement trusting on the fairness and good faith of the other. Fiduciary obligations should be extended reluctantly to commercial or business transactions.
>
> Plaintiffs refer to numerous terms of the franchise agreements which they believe show [defendant's] overweening control of the franchisees' operation and performance. Taken individually or together, these instances of discretion or authority under the contract do not make [defendant] anything more than a common franchisor. A franchisee's reasonable expectations are sufficiently protected by the standard of good faith and fair dealing governing the franchisor's exercise of contractual responsibilities and powers. This court has no cause to believe Kansas law would impose fiducial obligations on a franchisor for the sole reason of that status.

Id. at 1183 (internal quotations and citations omitted). Applying these principles, the court concluded that, because there was no mention of a fiducial relationship in the contract and because there was no evidence to show that plaintiffs placed any confidence and trust in defendants beyond that inherent in any relationship between a franchisor and franchisee, plaintiffs had not raised a "triable issue of fact" as to whether fiducial obligations existed. Id. Since Pizza Hut, courts applying Kansas law to franchisee suits against franchisors have uniformly refused to find a fiduciary relationship absent proof that the parties assumed fiduciary duties apart from their standard relationship. See, e.g.,

42

Rajala, 919 F.2d at 622-23; Wayman v. Amoco Oil Co., 923 F. Supp. 1322 (D. Kan. 1996); Bank IV Salina N.A. v. Aetna Cas. & Sur. Co., 810 F. Supp. 1196, 120607 (D. Kan. 1992).

Applying these cases and Denison's holding to the facts at bar, we conclude the evidence presented does not support the creation of an implied fiduciary relationship between Pittsburg Pepsi and PepsiCo. Pittsburg Pepsi has not shown that its relationship with PepsiCo is anything more than a standard business relationship, or that Pittsburg Pepsi imparted a particular confidence in PepsiCo. To the contrary, we find the evidence persuasively indicates the two parties were businesses acting at arms-length. Pittsburg Pepsi consistently has acted independently by not sharing any information regarding its franchise with PepsiCo. Similarly, because the EBAs authorized Pittsburg Pepsi to set its own prices, PepsiCo was powerless in cases where Pittsburg Pepsi ran into conflicts with its local customers due to the higher prices Pittsburg Pepsi charged. If Pepsico really was Pittsburg Pepsi's fiduciary, PepsiCo would have been able to exercise more control over Pittsburg Pepsi. Finally, and most importantly, there is no evidence that PepsiCo consciously assumed any fiduciary responsibilities. Absent such proof, Kansas law does not permit us to imply a fiduciary relationship. We conclude the district court properly granted PepsiCo's motion for summary judgment on the breach of fiduciary duty claim.

### Civil conspiracy by PepsiCo and Bottling Group

Pittsburg Pepsi claims that PepsiCo and Bottling Group engaged in an unlawful civil conspiracy to tortiously interfere with Pittsburg Pepsi's customers. A civil

43

conspiracy is not actionable under Kansas law without commission of some wrong giving rise to a tortious cause of action independent of conspiracy. Stoldt v. City of Toronto, 678 P.2d 153, 161 (Kan. 1984). "[T]he elements of a civil conspiracy include: (1) two or more persons; (2) an object to be accomplished; (3) a meeting of the minds in the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate cause thereof." Id. The district court summarily dismissed this claim because it determined Pittsburg Pepsi had not alleged sufficient facts to create a triable issue on the underlying tort claims. Because we have not found an actionable tort against PepsiCo, we agree with the district court's grant of summary judgment to PepsiCo on this claim. Further, because two parties are needed to engage in a civil conspiracy, we conclude Pittsburg Pepsi's claim against Bottling Group must fail.

**III.**

We REVERSE the district court's grant of summary judgment in favor of PepsiCo on Pittsburg Pepsi's breach of contract claim, which includes an implied duty of good faith and fair dealing, premised on PepsiCo's failure to protect Pittsburg Pepsi's territorial exclusivity. We REVERSE the district court's grant of summary judgment in favor of Bottling Group on Pittsburg Pepsi's tortious interference with current and prospective business relations claim as it relates to SEK. We REMAND these claims to the district court for further proceedings. We AFFIRM the district court's grant of summary judgment on the remaining claims.