FILED
United States Court of Appeals
Tenth Circuit

August 3, 2012

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EUREKA WATER COMPANY, an
Oklahoma corporation,

        Plaintiff - Appellee
/Cross-Appellant,

        v.

NESTLE WATERS NORTH
AMERICA, INC., a foreign
corporation,

        Defendant - Appellant
/Cross-Appellee.

No. 11-6104 and 11-6116

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. NO. 5:07-CV-00988-M)**

---

Adam H. Charnes, Kilpatrick Townsend & Stockton LLP, Winston-Salem, North
Carolina, (Richard D. Dietz, Kilpatrick Townsend & Stockton LLP, and Mark S.
Grossman, Jessica L. Perry, Crowe & Dunlevy, Oklahoma City, Oklahoma, with
him on the briefs), for Defendant - Appellant/Cross-Appellee.

Ronald T. Shinn Jr. (Robert H. Gilliland, Jr. and Joshua W. Solberg, with him on
the briefs), McAfee & Taft A Professional Corporation, Oklahoma City,
Oklahoma, for Plaintiff - Appellee/Cross-Appellant.

---

Before **LUCERO**, **HARTZ**, and **O'BRIEN**, Circuit Judges.

---

**HARTZ**, Circuit Judge.

Eureka Water Company contends that a 1975 agreement grants it the exclusive license in 60 Oklahoma counties to sell spring water and other products using the Ozarka trademark. It sued Nestle Waters North America, Inc., the current owner of the Ozarka trademark, to obtain a declaratory judgment of that right and to obtain monetary relief under several theories, including breach of contract, tortious interference with business relations, unjust enrichment, and promissory estoppel. A jury found for Eureka on its contract and tortious-interference claims, and the district court entered a judgment declaring that the 1975 agreement granted Eureka the exclusive right that it claimed in the Ozarka mark. In a postverdict ruling, the district court denied as duplicative Eureka's equitable claims based on unjust enrichment and promissory estoppel. After the district court denied Nestle's postverdict motion for judgment as a matter of law (JMOL), Nestle appealed.

Nestle argues on appeal that it is entitled to JMOL on the contract claim because the unambiguous terms of the 1975 agreement do not cover Ozarka spring water and that it is entitled to JMOL on the tortious-interference claim because its conduct was privileged and justified as a matter of law. In the alternative it seeks a new trial because the district court admitted a prejudicial privileged document, and a new trial or judgment in its favor because the district court erred in admitting testimony of Eureka's damages expert. On cross-appeal Eureka argues

that the district court erred in denying relief on its unjust-enrichment and promissory-estoppel claims. We have jurisdiction under 28 U.S.C. § 1291.

We agree with most of Nestle's principal arguments. First, we reverse the district court's denial of Nestle's motion for JMOL on the contract claim because the 1975 agreement unambiguously does not cover spring water and under Oklahoma contract law (which applies because the agreement does not come under the Uniform Commercial Code) extrinsic evidence on the contract's meaning was inadmissible. Our construction of the contract also requires us to vacate the district court's declaratory judgment. Second, we reverse the denial of JMOL on the tortious-interference claim because Eureka failed to show that Nestle's decision to charge Eureka what it charged other vendors for bottled water was not privileged or justified. Third, we affirm the denial of Eureka's unjust-enrichment claim because the claim is based on the false premise that Eureka's license to use the Ozarka trademark covers spring water. We reverse, however, the denial of Eureka's promissory-estoppel claim, remanding that claim for further consideration by the district court. Despite the remand, we need not address Nestle's evidentiary arguments because the document for which Nestle claims a privilege and the testimony of Eureka's expert witness do not appear to be relevant to any disputed issue regarding Eureka's promissory-estoppel claim.

## I. BACKGROUND

### A. Ozarka Spring Water and Ozarka Drinking Water

As early as 1907 Ozarka Water Company sold water that it obtained from a spring in Arkansas. It entered into franchise agreements to allow regional dealers to bottle Ozarka spring water and sell it in specified territories. Eureka was such a regional franchisee. Arrowhead Puritas Waters, Inc. purchased Ozarka in the late 1960s.

In 1971 Dave Raupe purchased Eureka, which sold only spring water. Shortly thereafter, Arrowhead concluded that Ozarka's supply of spring water was inadequate for further expansion and informed its franchisees that it was shutting down its springs. The franchisees could, however, start distributing facsimile drinking water, which was to be made from purified water by adding mineral concentrates for taste. Arrowhead ceased bottling spring water under the Ozarka label. Eureka and Arrowhead memorialized this arrangement in a 1972 franchise agreement, under which Eureka paid royalties on each gallon of drinking water that it sold.

A few years later Arrowhead and Eureka renegotiated their relationship. Their 1975 agreement (the 1975 Agreement) called for a one-time payment of $9,000 by Eureka in exchange for "a royalty-free, paid-up right and license to use the said OZARKA mark in connection with the processing, bottling, sale and

distribution within [Eureka's territory] of purified water and/or drinking water made from OZARKA drinking water concentrates." Aplt. App., Vol. 29 at 9397.

Arrowhead and Eureka independently began bottling spring water in 1983. In 1987 Arrowhead was acquired by Perrier Group of America, Inc. Two years later, Perrier began packaging Ozarka-branded water in single-serve plastic bottles (PET[1] bottles).

Nestle purchased Perrier in 1992 and began selling Eureka its PET spring water at below-market prices for resale to Eureka wholesale customers. (For convenience, we will now refer to the Perrier/Nestle entity as Nestle, even if the described events predate Nestle's purchase of Perrier.) In 1997, however, Eureka discovered that Nestle had been directly shipping Ozarka PET spring water to Sam's Club and Wal-Mart stores within Eureka's territory. In response to Eureka's claim that these sales violated the 1975 Agreement, Nestle agreed to pay Eureka 50 cents a case on all PET spring-water products and 30 cents a case for all bulk products (1-gallon and 2.5-gallon packages) that Nestle sold in Eureka's territory. The parties refer to the payments as royalties or invasion fees. Nestle did not pay royalties to any other bottler in the country. From 1997 until October 15, 2007, Eureka received 67 royalty checks totaling about $2.5 million.

---

[1] PET is apparently short for polyethylene terephthalate.

In late 2003 Nestle unilaterally reduced the royalty rates for both PET and bulk cases to 25 cents a case. Although Eureka continued to invoice Nestle for the difference, it was not paid.

In a May 2007 meeting, William Pearson, Vice President and chief financial officer of Nestle, told Steve Raupe, Eureka's CEO, that Nestle was losing money doing business with Eureka and that something had to change. Three months later Pearson wrote Raupe a letter stating that as of October 15, 2007, Nestle no longer would pay royalties or offer Eureka a lower price on Ozarka spring water than what Nestle charged comparable purchasers. This lawsuit followed.

## B.      District Court Proceedings

Eureka filed suit against Nestle on September 7, 2007, in the United States District Court for the Western District of Oklahoma. Jurisdiction was based on diversity of citizenship. *See* 28 U.S.C. § 1332. Eureka's amended complaint raised nine claims for relief. Relevant to this appeal are the claims for declaratory judgment, breach of contract, tortious interference with contractual and business relations, promissory estoppel, and unjust enrichment. All these claims were brought to trial.

Eureka's theory at trial on the contract claim was that the 1975 Agreement covered all Ozarka products, not just what the contract referred to as purified water and drinking water, and that Nestle had breached the Agreement by selling

Ozarka spring water to businesses within Eureka's exclusive territory. Eureka presented evidence that both Eureka and Arrowhead had intended the 1975 Agreement to cover all Ozarka products. Some evidence suggested that the 1975 Agreement was to be what Eureka terms a "Coke deal," similar to those entered into by Coca-Cola, which purportedly permit franchisees to bottle and distribute future Coca-Cola products not mentioned in the franchise agreement. Other evidence indicated that Nestle had believed that the 1975 Agreement covered all Ozarka products.

On its tortious-interference claim, Eureka argued to the jury that Nestle had wrongfully interfered with Eureka's relationships with wholesale customers by raising the price charged Eureka on spring water so high that Eureka could no longer profitably resell to those customers.

The jury awarded Eureka $9.2 million on the contract claim and $5 million on the tortious-interference claim. After the jury returned its verdict, the district court entered a declaratory judgment that the 1975 Agreement applies to all Ozarka products, including Ozarka spring water. It dismissed Eureka's unjust-enrichment and promissory-estoppel claims, finding that the verdict already included the allowable damages on those claims.

## II. DISCUSSION

On appeal Nestle argues that it is entitled to (1) JMOL on the contract claim because the unambiguous terms of the license agreement do not cover

Ozarka spring water; (2) JMOL on the tortious-interference claim because its conduct was privileged and justified as a matter of law; (3) judgment in its favor or a new trial because Eureka's only evidence of damages was improperly admitted testimony of Eureka's damages expert; and (4) in the alternative, a new trial because the district court admitted a highly prejudicial privileged document. Eureka argues on cross-appeal that the district court erred in denying relief on its unjust-enrichment and promissory-estoppel claims. We begin with Nestle's first two issues.

## A.    Contract Claim

We review *de novo* the district court's denial of a motion for JMOL. *See Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1243 (10th Cir. 2009). "In a diversity case such as this one, the substantive law of the forum state governs the analysis of the underlying claims . . . ." *Id.* at 1244 (internal quotation marks omitted). We will reverse the district court's denial of Nestle's motion for JMOL if "[d]rawing all reasonable inferences in favor of the nonmoving party, . . . the evidence points but one way and is susceptible to no reasonable inferences supporting the party opposing the motion." *Id.* (internal quotation marks omitted).

Eureka prevailed on its claim that the 1975 Agreement granted it the exclusive right within its territory to use the Ozarka mark in connection with all Ozarka products, including Ozarka spring water. To convince the jury of its

interpretation of the contract, it presented extrinsic evidence regarding the parties' course of dealing and Nestle's understanding of the Agreement. The district court ruled the contract facially unambiguous but admitted this extrinsic evidence after deciding that the 1975 Agreement was a contract for the sale of goods and therefore subject to Okla. Stat. tit. 12A, § 2-202 (part of Oklahoma's version of the Uniform Commercial Code (UCC)), which, it ruled, permits such evidence even when the contract appears unambiguous on its face. Nestle argues (1) that its agreement with Eureka was not a contract for the sale of goods and was therefore governed by Oklahoma common law rather than the UCC; (2) that under Oklahoma common law, extrinsic evidence is not admissible to create an ambiguity; and (3) that the 1975 Agreement unambiguously covers only purified water and drinking water, not spring water. We agree.

### 1. Applicability of UCC

In our view the UCC does not govern the 1975 Agreement. Article 2 of the Oklahoma UCC governs "transactions in goods." Okla. Stat. tit. 12A, § 2-102. "'Goods' means all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale . . . ." Okla. Stat. tit. 12A, § 2-105(1). This circuit has held that when a contract involves the sale of both goods and non-goods, an Oklahoma court would apply the "predominant factor" test to determine whether the UCC governs. *See Specialty Beverages, L.L.C. v. Pabst Brewing Co.*, 537 F.3d 1165, 1174 (10th Cir. 2008). To explain

why the Agreement is not under the UCC, we first summarize the Agreement, which consists of the recitals and seven numbered sections.

The recitals name Arrowhead (Nestle's predecessor) as "SUPPLIER" and Eureka as "DISTRIBUTOR" and summarize the parties' 1972 franchise agreement, which licensed Eureka to use the Ozarka trademark in return for paying royalties on each gallon of purified water and drinking water sold. Next the recitals state:

> The parties now believe that it will be to their mutual advantage to terminate the continuing obligation of DISTRIBUTOR under said Franchise Agreement to pay said royalties in consideration of a lump sum payment for a paid-up license; and to discontinue all obligations of SUPPLIER under said Franchise Agreement except for the obligation to furnish OZARKA drinking water concentrates at SUPPLIER's cost, the continued exercise of control over the quality of the drinking water sold by distributor under the OZARKA mark, and the maintenance of OZARKA registrations in the United States Patent Office for drinking water and for refrigerated and evaporative coolers for drinking water.

Aplt. App., Vol. 29 at 9396–97. After stating that Eureka has paid Nestle $9,000, the Agreement sets forth the parties' rights and obligations.

Section 1 ("LICENSE TO DISTRIBUTE, BOTTLE, ADVERTISE, AND SELL OZARKA PRODUCTS") grants Eureka:

> a royalty-free, paid-up right and license to use the said OZARKA mark in connection with the processing, bottling, sale and distribution within [Eureka's territory] of *purified water and/or drinking water made from OZARKA drinking water concentrates* and in connection with coolers and dispensers therefor, subject to the terms and conditions hereinafter set forth.

-10-

*Id.* at 9397 (emphasis added).  The section requires that "[a]ll OZARKA [purified and] drinking water bottled or sold by DISTRIBUTOR" be labeled and produced in accordance with specified standards, *id.* at 9398, and gives Nestle the right to inspect Eureka's production facilities and to terminate the agreement if Eureka fails to correct any deficiencies in its production process.  In addition, the section prohibits Nestle from granting any other party within Eureka's territory "a license to process, bottle or sell OZARKA drinking water."  *Id.* at 9401–02.

Section 2 ("THE SUPPLY OF OZARKA DRINKING WATER CONCENTRATES TO DISTRIBUTOR") requires that Nestle "furnish to DISTRIBUTOR OZARKA drinking water concentrates in such quantities as may be required by DISTRIBUTOR for production of OZARKA drinking water, charging DISTRIBUTOR therefor at its own cost plus freight."  *Id.* at 9402.  It further provides, however, that "DISTRIBUTOR may obtain OZARKA drinking water concentrates from a party other than SUPPLIER."  *Id.*  Once Eureka identifies the third-party supplier and Nestle is satisfied that the third party can maintain quality standards, Nestle will provide the formulation for the concentrates to the third party.  (Nestle stopped providing the concentrates to Eureka by 1987, and perhaps a number of years before that.)

Under Section 3 ("TERM AND TERMINATION") the 1975 Agreement "shall continue in full force and effect so long as DISTRIBUTOR shall continue the use of the OZARKA mark as licensed hereunder."  *Id.*  Section 4

-11-

("INFRINGEMENT BY THIRD PARTY") requires each party "to notify the other of any infringements of the trademark OZARKA within [Eureka's] Territory." *Id.* at 9403 (internal quotation marks omitted). Section 5 ("NOTICES") states that all mailings to Nestle are considered delivered when sent by registered mail to the specified address. *Id.* And Section 6 ("ASSIGNMENT") prohibits Eureka from assigning its rights under the Agreement to anyone without Nestle's written consent, unless it is selling its entire business. *Id.* at 9404. Finally, under Section 7 ("PRODUCT LIABILITY") Eureka bears sole liability for any third-party product-liability claims based on injury from the OZARKA products or their containers. *Id.*

Nestle argues that the 1975 Agreement is not a transaction in goods because it is a license for a trademark, which it claims is not a good under the UCC. We agree with Nestle that the Agreement includes a trademark license. Section 1 grants Eureka "a royalty-free, paid-up right and license to use the . . . OZARKA mark in connection with the processing, bottling, sale and distribution . . . of purified water and/or drinking water." *Id.* at 9397. We also agree with Nestle that a trademark license is not a "good" as that term is used in the UCC. Intellectual property is not a movable thing, *see* Okla. Stat. tit. 12A, § 2-105 ("'Goods' means all things . . . which are movable at the time of identification to the contract for sale . . . ."); rather, it is a type of intangible property, *see Penguin Group (USA) Inc. v. Am. Buddha*, 609 F.3d 30, 36 n.4 (2d Cir. 2010) ("a

-12-

copyright [is] . . . an intangible thing"); 1 McCarthy on Trademarks and Unfair Competition § 2:14 (4th ed. 2012) ("[I]n discussing 'ownership' of a trademark, we must recognize that we are dealing with intangible, intellectual property."). Although one can express the content of intellectual property in a movable medium (such as a trademark registration form), the intellectual property remains intangible. *See United States v. Brown*, 925 F.2d 1301, 1307 (10th Cir. 1991) ("Purely intellectual property . . . can be represented physically, such as through writing on a page, but the underlying, intellectual property itself, remains intangible."). Therefore, the grant of a trademark license is not a transaction in goods under the UCC. *See Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1359 n.2 (Fed. Cir. 2005) ("[A] license for intellectual property . . . is not a sale of goods."); *Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 161, 170 (3d Cir. 2001) (three-year exclusive license to use a trademark); *Grappo v. Alitalia Linee Aeree Italiane, S.p.A.*, 56 F.3d 427, 432 (2d Cir. 1995) (nonexclusive license for copyrighted material); *JRT, Inc. v. TCBY Sys., Inc.*, 52 F.3d 734, 739 (8th Cir. 1995) (contract for services and use of a trademark).

Admittedly, as Eureka points out, the 1975 Agreement also contemplates the sale of goods. Section 2 of the Agreement states that Nestle "shall furnish to [Eureka] OZARKA drinking water concentrates in such quantities as may be required by [Eureka] for production of OZARKA drinking water." Aplt. App., Vol. 29 at 9402. Drinking water concentrates are goods. The question, then, is

whether the license or the sale of goods is the predominant factor in the contract. *See Specialty Beverages*, 537 F.3d at 1174.

Here, there is little doubt that the license—not the right to purchase drinking-water concentrates—is what motivated the transaction. Eureka's right to purchase drinking-water concentrates was a matter of financial indifference to Nestle. The Agreement required Nestle to sell Eureka the concentrates at Nestle's cost plus freight. And from Eureka's point of view, although the concentrates enabled it to sell Ozarka drinking water, it could not engage in those sales without the license granted by the Agreement. *See Grappo*, 56 F.3d at 432 (training manuals would have been useless absent a copyright license to use them). Moreover, the Agreement could be fully consummated without any sales of concentrates from Nestle to Eureka; if Eureka found a suitable supplier, Nestle would provide the supplier with the intellectual property (the formulation for the concentrates) necessary to produce the concentrates for Eureka.

Eureka relies on *Pepsi-Cola Bottling Co. of Pittsburgh, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241 (10th Cir. 2005), where we held that New York's version of the UCC governed a contract granting a bottling company an exclusive territory to bottle and distribute Pepsi-Cola. *See id.* at 1248, 1255–56 n.7. But *Pepsi-Cola Bottling* is distinguishable. The contract in that case required the bottling company to purchase all its Pepsi-Cola concentrate from PepsiCo, *see id.* at 1248 ("[T]he Company will sell to the Bottler, and the Bottler will purchase, at the

-14-

Company's then price or prices . . . at the time of each sale, the Bottler's requirements of Pepsi-Cola concentrate or syrup for the bottling of Pepsi-Cola hereunder." (internal quotation marks omitted)), and PepsiCo was not required to sell the syrup at cost. Presumably, PepsiCo made its money by selling the syrup. Although the bottler did not purchase the concentrate directly from PepsiCo, it did so indirectly, as a member of a 27-bottler cooperative. *See id.* at 1248 n.1. The financial core of the contract was the purchase and sale of syrup—a good.

To be sure, we observed in *Pepsi-Cola Bottling* that "an overwhelming majority of . . . jurisdictions have held that distributorship contracts are sales contracts and thus governed by the UCC." *Id.* at 1256 n.7; *see also Specialty Beverages*, 537 F.3d at 1174–75 (Oklahoma Supreme Court would, in accordance with the majority rule, apply the UCC to a distribution agreement because the sale of goods is the predominant factor). And we recognize that the 1975 Agreement refers to the parties as "Supplier" and "Distributor." But it is the substance of the Agreement that controls, and the substance is not a distribution contract. "In the world of goods, a distribution contract is a commitment by a manufacturer to sell products to a distributor with the expectation that the distributor will resell them to others in the stream of commerce." Raymond T. Nimmer, *Through the Looking Glass: What Courts and UCITA Say About the Scope of Contract Law in the Information Age*, 38 Duq. L. Rev. 255, 294–95 (2000). Under the 1975 Agreement, unlike a distribution agreement, the sale of goods from "Supplier" to

"Distributor" is only an incidental, and perhaps nonexistent (Nestle quit supplying the concentrates no later than 1987), component of the contractual relationship.

Accordingly, we hold that the UCC does not govern the 1975 Agreement; rather, Oklahoma common law governs.

### 2. Admissibility of Extrinsic Evidence Under Oklahoma Common Law

Eureka argues that under Oklahoma common law the circumstances surrounding execution of a contract are admissible to establish intent. But the most recent Oklahoma case authority that it cites is from 1980. Whatever the law may have been then, that is not Oklahoma law now. Under current Oklahoma common law, extrinsic evidence is not admissible to create an ambiguity in a contract that is unambiguous on its face. In *Mercury Investment Co. v. F.W. Woolworth Company*, 706 P.2d 523, 529 (Okla. 1985), the state supreme court wrote:

> [T]he practical construction of an agreement, as evidenced by the acts and conduct of the parties, is available only in the event of an ambiguity. But where a contract is complete in itself and, as viewed in its entirety, is unambiguous, its language is the only legitimate evidence of what the parties intended. The intention of the parties cannot be determined from the surrounding circumstances, but must be gathered from a four-corners' examination of the contractual instrument in question.

(emphasis omitted). *See Bank of Oklahoma, N.A. v. Red Arrow Marina Sales & Serv., Inc.*, 224 P.3d 685, 699 (Okla. 2009) ("Where a contract is complete in itself and, as viewed in its entirety, contains clear and explicit language leaving it

-16-

free of ambiguity, its language is the only legitimate evidence of what the parties

intended."); *Otis Elevator Co. v. Midland Red Oak Realty, Inc.*, 483 F.3d 1095,

1102 n.10 (10th Cir. 2007) ("[T]he Oklahoma Supreme Court's most recent

pronouncement [is that] extrinsic evidence may not be used to interpret an

unambiguous contract in Oklahoma.").

We therefore turn to the question whether the 1975 Agreement is

ambiguous regarding whether it covers all Ozarka products, including spring

water, or covers only purified water and drinking water. "Whether a contract is

ambiguous and hence requires extrinsic evidence to clarify the doubt is a question

of law for the courts." *Pitco Prod. Co. v. Chaparral Energy, Inc.*, 63 P.3d 541,

545 (Okla. 2003); *see King v. PA Consulting Group, Inc.*, 485 F.3d 577, 589 (10th

Cir. 2007) ("Whether a contract is ambiguous is a question of law that we review

de novo.").

### i.    Facial Ambiguity

"A contract is ambiguous if it is reasonably susceptible to at least two

different constructions. To decide whether a contract is ambiguous we look to the

language of the entire agreement. A contract must be considered as a whole so as

to give effect to all its provisions." *Pitco*, 63 P.3d at 545–46 (footnotes omitted).

In our view, the 1975 Agreement is not reasonably susceptible to two different

constructions regarding the type of water that it concerns. Its plain language

-17-

grants Eureka a right to use the Ozarka trademark only in connection with purified water and what it terms drinking water.

The language granting Eureka a license to use the Ozarka trademark is unequivocal:

> The Franchise Agreement between the parties of [Arrowhead] and [Eureka] is hereby terminated and [Eureka] is granted a royalty-free, paid-up right and license to use the said OZARKA mark in connection with the processing, bottling, sale and distribution within [a specified region] of *purified water and/or drinking water made from OZARKA drinking water concentrates . . . .*

Aplt. App., Vol. 29 at 9397 (emphasis added). No reasonable reading of this paragraph could extend Eureka's right to use the Ozarka trademark to spring water. The provision lists only "purified water" and "drinking water" without referencing any other products.

At least three other parts of the Agreement further support this conclusion. First, § 1 sets forth detailed standards that Eureka must follow in producing and labeling purified water and drinking water, with no reference to spring water or any other Ozarka products. The purified-water provision states that "[a]ll *purified water* sold under the OZARKA mark . . . shall be designated as *purified water* with the method of preparation specified" and that "[t]he mineral content of any such *purified water* sold . . . shall not at any time exceed ten (10) parts per million by weight." *Id.* at 9398 (emphasis added).[2] The drinking-water provision

_____

[2] The requirement reads in full:

(continued...)

-18-

states that "[a]ll OZARKA *drinking water* sold by DISTRIBUTOR shall be produced from *purified water* plus OZARKA *drinking water* concentrates" and that "[a]ll OZARKA *drinking water* bottled or sold by DISTRIBUTOR shall be produced in accordance with the production and control specifications of *drinking water . . .* supplied to DISTRIBUTOR by SUPPLIER." *Id.* (emphasis added).[3]

---

[2](...continued)
All purified water sold under the OZARKA mark whether produced by distillation, deionization or other means of demineralization shall be designated as purified water with the method of preparation specified, i.e., "Purified Drinking Water Prepared by Distillation," or by such other designation as may be approved by SUPPLIER in writing. The mineral content of any such purified water sold under the OZARKA mark shall not at any time exceed ten (10) parts per million by weight.

Aplt. App., Vol. 29 at 9398.

[3] The paragraphs setting forth these requirements are as follows:

All OZARKA drinking water sold by DISTRIBUTOR shall be produced from purified water plus OZARKA drinking water concentrates. The labeling shall conform substantially to the form of label annexed hereto as Exhibit I or as may be modified from time to time by SUPPLIER through written notice to DISTRIBUTOR.

Aplt. App., Vol. 29 at 9398.

All OZARKA drinking water bottled or sold by DISTRIBUTOR shall be produced in accordance with the production and control specifications of drinking water effective March 7, 1972 supplied to DISTRIBUTOR by SUPPLIER, and DISTRIBUTOR shall conform in all respects to the quality control provisions respecting concentration, sanitation, sampling, and other procedures set forth in said production and control specifications.

(continued...)

Later § 1 states that "SUPPLIER . . . shall have access to the *purification and drinking water* production facilities of DISTRIBUTOR at all times during normal operations hours for the purpose of checking . . . the quality of the *purified and/or drinking water* produced by DISTRIBUTOR," *id.* at 9399 (emphasis added);[4] and that "[a]ll labels employed by DISTRIBUTOR for use on or in connection with OZARKA *drinking water* and/or OZARKA *purified water* shall first be approved

---

[3](...continued)
*Id.* at 9398–99.

[4] The full text of this requirement is:

SUPPLIER through its qualified representative shall have access to the purification and drinking water production facilities of DISTRIBUTOR at all times during normal operations hours for the purpose of checking the procedures employed by DISTRIBUTOR in the operation of such facilities and the quality of the purified and/or drinking water produced by DISTRIBUTOR and bottled and sold by it under the OZARKA trademark. SUPPLIER shall from time to time inspect the OZARKA water production and bottling operations of DISTRIBUTOR and take production line samples for tasting and laboratory analysis. DISTRIBUTOR will also send production line samples to SUPPLIER for quality control testing at least quarterly. Such inspections by SUPPLIER shall be in addition to any and all supply of written data to DISTRIBUTOR, as may be required under the production and control specifications, and in addition to any and all inspections and analyses required under United States Public Health drinking water regulations, as well as any state regulations of the state within which DISTRIBUTOR is operating, and DISTRIBUTOR agrees to comply with all such Federal and state regulations controlling the standards of drinking water, as well as the said production and control specifications of SUPPLIER.

Aplt. App., Vol. 29 at 9399–9400.

in writing by SUPPLIER for trademark usage," *id.* at 9400 (emphasis added).[5]

The language of § 1 unequivocally establishes that neither purified water nor drinking water encompasses spring water.

Likewise, § 2 of the Agreement makes no mention of spring water. It provides terms for the supply of materials necessary for producing drinking water, saying that Nestle "shall furnish DISTRIBUTOR OZARKA *drinking water* concentrates . . . for the production of OZARKA *drinking water*." *Id.* at 9402 (emphasis added).

We also note that the recitals reference only purified water and drinking water. The summary of the 1972 franchise agreement states that under that agreement Eureka had "installed facilities for production of OZARKA 'scientifically prepared' *drinking water* produced by adding OZARKA *drinking water* concentrates to *purified water*" and "ha[d] been engaged in the sale of such OZARKA *drinking water* and OZARKA *purified water* in [Eureka's territory]."

_____

[5] This requirement states in full:

> All labels employed by DISTRIBUTOR for use on or in connection with OZARKA drinking water and/or OZARKA purified water shall first be approved in writing by SUPPLIER for trademark usage and compliance with state and Federal labeling laws, and all advertising and listings and printed matter of DISTRIBUTOR shall also be submitted for approval to SUPPLIER prior to publication where the mark OZARKA is included in the listing, advertisement, or other printed matter.

Aplt. App., Vol. 29 at 9400.

*Id.* at 9396 (emphasis added).  In short, nothing in the Agreement indicates that it covers spring water.

Eureka responds that the Agreement is ambiguous because on several occasions it uses the terms *Ozarka products* and *Ozarka waters*.  But "[a] contract must be considered as a whole so as to give effect to all its provisions without narrowly concentrating upon some clause or language taken out of context." *Mercury Inv. Co.*, 706 P.2d at 529; *see also* Okla. Stat. tit. 15, § 157 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the others.").  When viewed in light of the Agreement's focus on purified water and drinking water, the references to *Ozarka products* and *waters* cannot reasonably be read to expand the scope of the licensing provision beyond the only two specific products mentioned.  Rather, the unmodified terms *products* and *waters* are clearly used only as shorthand for the products and waters specified elsewhere, just as we have often referred to the 1975 Agreement as "the Agreement."  For example, Eureka points to the licensing provision's heading:  "LICENSE TO DISTRIBUTE, BOTTLE, ADVERTISE, AND SELL OZARKA PRODUCTS."  Aplt. App., Vol. 29 at 9397.  But immediately following the heading is the statement that the license granted is "in connection with the . . . distribution . . . of purified water and/or drinking water."  *Id.*  The only licensed Ozarka "products" are purified water and drinking water.  The heading cannot reasonably be interpreted as

-22-

expanding the coverage of the provision. Similarly, the sole appearances of the term *Ozarka water(s)* in the Agreement are in subsections 1(d) and 1(f), which allow Nestle to inspect Eureka's purification and drinking-water production facilities and which require Eureka's compliance with production standards that are applicable only to purified water and drinking water—the only "waters" of interest.

Eureka also claims that the Agreement's reference to trademark registration number 836,026, which is a registration for Ozarka drinking water, creates an ambiguity because in 1967, when Ozarka (Arrowhead's predecessor) registered the trademark, it sold only Ozarka spring water.[6] Eureka argues that "[i]t is reasonable to conclude that based on the reference to this trademark, Arrowhead and Eureka believed that spring water and drinking water are sufficiently alike that a trademark or license for one necessarily covers the other." Aplee. Br. at 25. Eureka's argument fails because it relies on extrinsic evidence—evidence

[6] The reference appears in the Agreement's recitals:

> The parties now believe that it will be to their mutual advantage to terminate the continuing obligation of DISTRIBUTOR under said Franchise Agreement to pay said royalties in consideration of a lump sum payment for a paid-up license, and to discontinue all obligations of SUPPLIER under said Franchise Agreement except for . . . the maintenance of OZARKA registrations in the United States Patent Office for drinking water and for refrigerated and evaporative coolers for drinking water, Nos. 836,026 and 876,741, issued September 26, 1967 and March 5, 1969, respectively.

Aplt. App., Vol. 29 at 9396–97.

-23-

that in 1967 Ozarka sold only spring water. But even if we could consider the evidence, and even if whoever filed the trademark thought that "drinking water" encompassed spring water, that does not tell us the meaning of "drinking water" in the 1975 Agreement eight years later. The Agreement specifies that the drinking water it covers must be produced by adding concentrates to purified water, and no one has suggested that spring water is so produced.

### ii.    Latent Ambiguity

Eureka seeks to escape the Oklahoma rule against the use of extrinsic evidence to interpret an unambiguous contract by invoking an exception to the general rule—the exception for latent ambiguities. "A 'latent ambiguity' is one not evident from the face of the instrument alone but becomes apparent when applying the instrument to the facts as they exist." *Ryan v. Ryan*, 78 P.3d 961, 964 (Okla. Civ. App. 2003). "It arises when language is clear and intelligible and suggests but a single meaning, but some extrinsic fact or some extraneous evidence creates a necessity for interpretation or a choice between two or more possible meanings." *Id.* at 965; *see id.* ("Where a writing contains a reference to an object or thing, such as a pump" but extrinsic evidence shows "that there are two or more things or objects, such as pumps, to which it might properly apply, a latent ambiguity arises." (internal quotation marks omitted)). The canonical examples of latent ambiguity are contracts (or wills) that describe a thing (or person) with a proper noun when two such things bear the same proper noun.

Many commentaries have been written on *Raffles v. Wichelhaus*, 2 H. & C. 906, 159 Eng. Rep. 375 (Ex. 1864), in which the contract concerned the purchase of a shipment of cotton to be delivered from Bombay on the ship "Peerless." Unfortunately, two ships of that name had departed from Bombay two months apart.

The Oklahoma Supreme Court's decision in *Druggists' Mutual Fire Insurance Co. of Iowa v. Shaw*, 41 P.2d 69 (Okla. 1935) (per curiam), illustrates the point. A business that occupied two adjacent buildings on lot 10, block 7—a two-story building and a one-story building—purchased an insurance policy covering property "contained in the two-story non-combustible roof brick building situated on lot 10, Block 7." *Id.* at 69–70 (internal quotation marks omitted). A fire destroyed the property in the one-story building, and the insurer denied coverage. *See id.* at 70. The business argued that the policy had a latent ambiguity and that it could therefore introduce extrinsic evidence showing that the parties intended the contract to cover property in the one-story building. *See id.* The court held that the extrinsic evidence was inadmissible because there was no uncertainty in applying the terms of the contract to the facts as they existed; the policy covered a two-story building on a specified lot and there was in fact a single two-story building on that lot. *See id.* The court said that the situation would have been different had there been two two-story buildings, or no two-

story building. *See id.* But it refused to allow the parties, "under the guise of a latent ambiguity, [to] contradict the plain terms of the written instrument." *Id.*

Here, Eureka has failed to identify any latent ambiguity in the 1975 Agreement. Perhaps the latent-ambiguity doctrine might allow Eureka to prove that the parties understood the term *purified water* or *drinking water* in the 1975 Agreement to mean something broader than the purified water or drinking water described in that Agreement, although one could doubt whether such proof would be possible in light of the precise language of the Agreement defining purified water and drinking water. In any event, all that is referred to in Eureka's brief on appeal to show a latent ambiguity is the following:

> (1) Trademark No. 836,026 suggests that Arrowhead believed that drinking water and spring water were functionally interchangeable; (2) Nestle aggressively sought to buy from Eureka a right which it now claims Eureka did not possess under the 1975 Bottling Agreement and that it could regain by merely terminating a supplemental agreement with reasonable notice; (3) for nearly two decades, Nestle extended special pricing and paid invasion fees to Eureka for sales made into its territory, all applicable to Ozarka spring water; and (4) for nearly thirty years, Nestle and its predecessors-in-interest were aware of and acquiesced to Eureka's continued expansion of Ozarka products in Oklahoma.

Aplee. Br. at 40. We have previously concluded, however, that the trademark application does not indicate that the term *drinking water* as defined in the 1975 Agreement encompasses spring water. And items 2, 3, and 4 do not show how the parties defined the terms *purified water* or *drinking water* (as extrinsic evidence might show which ship named "Peerless" the parties were referring to) but are

-26-

simply evidence of the parties' general intent in entering into the Agreement. This evidence was used at trial to prove that the agreement was meant to include more than the purified water and drinking water specified in the Agreement, not that the term *purified water* or *drinking water* actually encompassed spring water. Such evidence of general intent, not tied to the specific usage of a particular word or term, does not establish a latent ambiguity. If it did, the latent-ambiguity exception would swallow the general rule barring extrinsic evidence.

Thus, we hold that the 1975 Agreement applies only to purified water and drinking water. The declaratory judgment and the jury's verdict to the contrary (including the damages award) must be reversed. We remand to the district court for entry of judgment in favor of Nestle on the contract claim.

## B.    Tortious Interference Claim

From 1990 until 2007 Eureka supplied PET spring water to several wholesale customers after purchasing that water from Nestle at a below-market price. Eureka contends that in October 2007 Nestle began tortiously interfering with its customer relationships in two ways: (1) by ceasing to offer the discounted price, which made it impossible for Eureka to sell to wholesalers at a profit, and (2) by selling directly to Eureka's customers.

The cause of action for tortious interference with a contractual or business relationship has four elements that must be proved by the plaintiff: "(1) the interference was with an existing contractual or business right; (2) such

interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage." *Wilspec Techs., Inc. v. DunAn Holding Grp., Co.*, 204 P.3d 69, 74 (Okla. 2009). Nestle argues that it is entitled to JMOL on Eureka's tort claim because Eureka failed to satisfy the first, third, and fourth elements. Because we agree that Eureka failed to carry its burden on the third element, we need not address the others.

It is undisputed that the increase in price charged by Nestle to Eureka for PET spring water brought the price in line with what Nestle charged other wholesale customers. Nestle's opening brief on appeal contends that the price increase was justified and privileged. In response, Eureka makes two arguments. Neither is persuasive.

First, Eureka asserts that "[e]ven assuming *arguendo* that Nestle's decision to raise Eureka's prices was justified, its subsequent sales into Eureka's exclusive territory surely were not. Nestle had no legitimate interest in having relationships with Ozarka customers in Eureka's territory." Aplee. Br. at 46. But we have already held that Eureka did not have any exclusive territory with respect to spring water. Moreover, the only evidence relating to sales of PET spring water by Nestle to former Eureka wholesale customers is that the customers contacted Nestle after Eureka quit selling them the PET spring water and advised them to call Nestle to obtain the product.

Eureka's second argument is two-sentences long: "Nestle justified its price increase on false pretenses, telling Eureka it was losing money on Ozarka sales in Eureka's territory. Nestle actually profited there." *Id.* It is not uncommon, however, for a business to speak in terms of "losing" money when it is missing out on an opportunity to make more money. And as Eureka itself states in its opening brief, "[B]y selling at prices necessary to provide [an] incentive to Eureka, Nestle was sacrificing margins that it realized in other markets where it operated without Eureka." *Id.* at 11 n.8. In any event, any "false pretense" was not wrongful to Eureka. The decision to raise the prices to Eureka was not negotiated but was a unilateral act by Nestle. Eureka does not make, and could not make, any claim that it relied on the alleged false pretense. In short, Eureka has failed to show why Nestle did not have the same right as any other seller of goods to treat all similarly situated customers the same, absent a contractual obligation to the contrary. We therefore reverse the judgment on the tortious-interference claim and remand to the district court to grant JMOL to Nestle on this claim.

## C. Equitable Claims

After the jury returned its verdict in favor of Eureka, the district court dismissed Eureka's equitable claims of unjust enrichment and promissory estoppel on the ground that the jury's verdict had afforded Eureka full relief. Eureka cross-appeals that decision. Because we reverse the jury verdict on the

contract and tortious-interference claims, the basis for the district court's denial is no longer sound. We therefore consider whether we should remand these claims for further consideration by the district court.

### 1. Unjust Enrichment

Eureka claims that Nestle was unjustly enriched by not paying Eureka the royalty owed on Nestle's sales of PET spring water to Sam's Clubs within Eureka's territory. We affirm the district court's dismissal of the claim because the claim is based on a premise we have just held to be false. Eureka's opening brief states its theory to support the claim: "Because Eureka has a license for all Ozarka products, Nestle has indisputably been unjustly enriched by all unauthorized sales occurring prior to October 15, 2007." *Id.* at 71. But Eureka had no such license for spring water, so the claim must fail.

Eureka's reply brief on cross-appeal raises an additional theory. It suggests that the unjust-enrichment claim is not based on the 1975 Agreement but on a later "invasion fee agreement," Aplee. Reply Br. at 9, an alleged promise by Nestle in 1997 to pay a royalty on its sales to customers in Eureka's territory (purportedly because such sales invaded Eureka's rights under the 1975 Agreement). Eureka claims that Nestle failed to comply fully with its promise. But this contention is not stated sufficiently clearly in Eureka's opening brief on cross-appeal to preserve the issue. *See Becker v. Kroll*, 494 F.3d 904, 913 n.6 (10th Cir. 2007) ("An issue or argument insufficiently raised in the opening brief

-30-

is deemed waived."). Although the brief refers to the 1997 promise, it relies on Eureka's license, not the invasion-fee agreement, to establish the unjust-enrichment claim, stating that the money saved by Nestle by not paying the agreed-upon royalties "came at the expense of Eureka's exclusive rights." Aplee. Br. at 72.

Further, Eureka does not point to where this theory was raised below. Eureka's statement of legal issues in the final pretrial order says almost nothing about the unjust-enrichment claim, merely reciting a two-sentence statement of the general principle, and certainly does not raise this specific theory. Eureka's proposed jury instructions on the unjust-enrichment claim, which were ultimately not given to the jury, clearly based the claim on Eureka's license rights, stating as the first element of the claim: "[Eureka] owns the right to the Ozarka mark." Aplt. App., Vol. 3 at 834. Likewise, at the hearing on Nestle's Rule 50 motion (held after the close of evidence but before closing arguments), it said that its unjust-enrichment claim was "based on the license agreement." *Id.*, Vol. 27 at 8979. And Eureka's postjudgment brief on its equitable claims also relies on the license agreement. Although it mentions the alleged 1997 promise by Nestle, the reference is only to justify an award based on promissory estoppel. As we have repeatedly declared, we will not consider theories not advanced in the lower court. *See ClearOne Commc'ns, Inc. v. Biamp Sys.*, 653 F.3d 1163, 1182 (10th Cir. 2011) ("This court will generally not consider an argument that was not

raised in the district court.").  Ordinarily we rely on the opposing party to raise

failure to preserve an argument, *see Westefer v. Snyder*, 422 F.3d 570, 584 n.20

(7th Cir. 2005) ("a defense of waiver may itself be waived if not raised"); but

Nestle had no opportunity to brief the matter after Eureka's reply brief.

### 2.     Promissory Estoppel

Eureka's promissory-estoppel claim is based on Nestle's alleged failure to

fulfill two promises.  First, Eureka claims that in 1997 Nestle agreed to

compensate Eureka for each case of Ozarka product that Nestle shipped directly

into Eureka's territory—50 cents for PET products and 30 cents for bulk products.

Over the next 10 years Nestle sent Eureka 67 checks totaling about $2.5 million.

But Eureka claims that Nestle still owes it $1,056,474 because in late 2003 Nestle

unilaterally reduced the royalty rates for both PET and bulk cases to 25 cents a

case.  Nestle never paid as originally promised, even though Eureka sent invoices

for the difference.  Second, in the early 1990s Eureka began invoicing Nestle for

pickup allowances, billbacks, promotions, and trade discounts, and up until 2007

Nestle reimbursed Eureka for those fees.  But Eureka claims that Nestle has

refused to reimburse it for 29 invoices totaling approximately $298,000.

A claim for promissory estoppel has four elements:  "(1) a clear and

unambiguous promise, (2) foreseeability by the promisor that the promisee would

rely upon it, (3) reasonable reliance upon the promise to the promisee's detriment

and (4) hardship or unfairness can be avoided only by the promise's

-32-

enforcement." *Garst v. Univ. of Okla.*, 38 P.3d 927, 931 (Okla. Civ. App. 2001) (internal quotation marks omitted).  Nestle does not contend that Eureka failed to establish any of the four elements listed above.  Instead, it argues that Eureka cannot recover under promissory estoppel because Eureka's evidence failed to satisfy a fifth element—that Nestle made false representations or concealed facts.  But, as Eureka points out, Nestle failed to raise its "misrepresentation" argument below.  Therefore, we will not consider it, *see ClearOne*, 653 F.3d at 1182, and we remand for further proceedings on the claim.

### D.    Evidentiary Issues

Nestle also raises two evidentiary issues on appeal.  It argues that the district court erroneously admitted at trial a privileged document and Eureka's expert testimony on damages.  The arguments are not frivolous, but we need not address them.  The only claim remaining on remand is Eureka's promissory-estoppel claim, and the challenged evidence is irrelevant to that claim.  The expert testimony concerned only the value of Eureka's business, not the value of the unpaid royalties and other fees sought under the promissory-estoppel claim (and which can be computed without the aid of an expert).  As for the allegedly privileged document, Eureka introduced it at trial as extrinsic evidence of the meaning of the 1975 Agreement.  Although it may marginally support one element of Eureka's promissory-estoppel claim—that Nestle had promised Eureka to make royalty and other payments—Eureka did not rely on the document in its

motion below for judgment on the promissory-estoppel claim. We do not expect the document to be material to the district court's consideration of the promissory-estoppel claim on remand.

## III. CONCLUSION

We REVERSE the district court's denial of Nestle's motion for judgment as a matter of law on Eureka's contract and tortious-interference claims, REVERSE the declaratory judgment, and REMAND to the district court with instructions to enter judgment in favor of Nestle on the contract and tortious-interference claims. We REVERSE the district court's denial of Eureka's promissory-estoppel claim and REMAND that claim to the district court for further consideration in light of this opinion. We AFFIRM the district court's denial of relief on Eureka's unjust-enrichment claim.